# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| **JARED MCNEEL, et al.** | § | |
| *Plaintiffs* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:19-cv-178** |
| | § | |
| **KIDDIE ACADEMY** | § | |
| **INTERNATIONAL, INC., et al.** | § | |
| *Defendants* | § | |

## AFFIDAVIT OF MICHAEL J. MILLER

| | |
|---|---|
| THE STATE OF MARYLAND | § |
| | § |
| COUNTY OF *Harford* | § |

BEFORE ME, the undersigned authority, on this day personally appeared Michael J. Miller, Executive Chairman of Essential Brands, Inc., the sole Owner and Member of Kiddie Academy Domestic Franchising, LLC, who, being by me duly sworn, deposed and said:

1. My name is Michael J. Miller. I am over the age of eighteen years, I am of sound mind, and I have never been convicted of a felony or of any crime of moral turpitude. I am competent to make this affidavit and the facts stated herein are based on my personal knowledge and are true and correct.

2. I am currently the Executive Chairman of Essential Brands, Inc., which is the sole owner and member of Kiddie Academy Domestic Franchising, LLC (hereinafter referred to as "KADF") and I am also a Custodian of Records for KADF. Prior to serving in this position, I was the President and CEO for Essential Brands, Inc.

3. It was part of my responsibility as President and CEO to receive and review franchise applications and to participate in the selection of potential franchisees for KADF. In this particular case, I executed the Franchise Agreement entered into with Cory and Summer Bullock on behalf of KADF and am an authorized representative for this entity by virtue of my position. As a result of my position, I am familiar with the litigation and the business records of KADF.

4. The following Exhibit B-1 attached to this Affidavit is a true and correct copy of business records of KADF and is fully incorporated herein by reference. As a custodian of records for KADF, I have attached Exhibit B-1 from KADF, and it was in the regular course of business of KADF for an employee or representative of

KADF, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

**Exhibit B-1** – True and Correct Copy of the Kiddie Academy Domestic Franchising Agreement, dated March 12, 2007, between Kiddie Academy Domestic Franchising, LLC, Franchisor, and Cory Bullock and Summer Martin Bullock, collectively Franchisee.

FURTHER AFFIANT SAITH NAUGHT.

_____
Michael J. Miller, Executive Chairman,
Essential Brands, Inc. and Authorized
Member and a Custodian of Records for
Kiddie Academy Domestic Franchising, LLC

SUBSCRIBED AND SWORN TO BEFORE ME by MICHAEL J. MILLER on this the 15th day of _April_____, 2020.

NICOLE LYNN MIDDLEBROOKS
Notary Public-Maryland
Harford County
My Commission Expires
September 12, 2022

_____
Notary Public in and for
The State of Maryland    9/12/2022

2

# EXHIBIT B-1

# KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC


## FRANCHISE AGREEMENT

between

**Kiddie Academy Domestic Franchising, LLC**
(a Delaware limited liability company),

Franchisor,

and

**Cory Bullock** and **Summer Martin Bullock**
(husband and wife),

collectively, Franchisee.

# KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC

## FRANCHISE AGREEMENT

## TABLE OF CONTENTS

| Subject | Page |
|---|---|
| 1. GRANT | 2 |
| 2. TERM | 3 |
| 3. RENEWAL | 4 |
| 4. LOCATION OF KIDDIE ACADEMY FRANCHISE | 5 |
| 5. DUTIES OF FRANCHISOR | 8 |
| 6. DUTIES OF FRANCHISEE | 10 |
| 7. FEES | 19 |
| 8. TRAINING | 21 |
| 9. MARKS | 24 |
| 10. KIDDIE ACADEMY MANUALS | 27 |
| 11. CONFIDENTIAL INFORMATION | 28 |
| 12. REPORTING AND RECORDS | 29 |
| 13. ADVERTISING | 33 |
| 14. INSURANCE | 38 |
| 15. TRANSFER OF INTEREST | 41 |
| 16. DEFAULT AND TERMINATION | 47 |
| 17. OBLIGATIONS UPON TERMINATION OR EXPIRATION | 55 |
| 18. COVENANTS | 58 |
| 19. TAXES, PERMITS, AND INDEBTEDNESS | 61 |
| 20. INDEPENDENT CONTRACTOR | 62 |
| 21. APPROVAL | 63 |
| 22. NONWAIVER | 63 |
| 23. NOTICES | 64 |
| 24. ENTIRE AGREEMENT | 64 |
| 25. SEVERABILITY AND CONSTRUCTION | 65 |
| 26. APPLICABLE LAW | 66 |
| 27. ARBITRATION | 67 |
| 28. ACKNOWLEDGMENTS | 68 |

# KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC

## FRANCHISE AGREEMENT

**THIS AGREEMENT** is made and entered into by and between **Kiddie Academy Domestic Franchising, LLC**, a Delaware limited liability company with offices at 108 Wheel Road, Bel Air, Maryland 21015 (the "Franchisor"), and **Cory Bullock** and **Summer Martin Bullock** (husband and wife), two adult individuals with a primary address of 141 Greenridge Circle, League City, Texas 77573 (collectively, "Franchisee").

**WHEREAS**, Franchisor has expended time, skill, effort and money in developing, and has, in fact, developed and owns a specialized system for the establishment and operation of child care learning centers that offer academic and social enrichment, as well as education-based child care services, for children who are six (6) weeks to twelve (12) years old (the "Kiddie Academy System");

**WHEREAS,** the distinguishing characteristics of the Kiddie Academy System include, without limitation, distinctive interior and exterior design, décor, layout and color scheme; exclusively designed signage, equipment, furnishings, forms and materials; specialized educational equipment and materials; the Kiddie Academy Manuals, the Kiddie Academy Curriculum; uniform operating methods, procedures and techniques; proprietary software; and other confidential operating procedures, methods and techniques for controlling inventory and costs, record keeping and reporting, personnel/management, purchasing, sales promotion, marketing and advertising (all of which may be changed, improved and further developed by Franchisor from time to time);

**WHEREAS**, Franchisor identifies the Kiddie Academy System by means of certain trade names, service marks, trademarks, logos, logotypes, emblems and indicia of origin, including, but not limited to, the mark "KIDDIE ACADEMY" [with design], and such other trade names, service marks and trademarks as are now designated (and which may be designated, by Franchisor in writing in the future) for use in connection with the Kiddie Academy System (the "Marks");

**WHEREAS**, Franchisor continues to develop, use and control the use of the Marks in order to identify for the public the source of services marketed under the Marks and according to the Kiddie Academy System, and to represent the Kiddie Academy System's high standards of quality, appearance and service;

**WHEREAS**, Franchisor grants to qualified persons franchises to own and operate Kiddie Academy Child Care Learning Centers which provide learning, recreational and education-based child care services and activities authorized and approved by Franchisor and utilizing the Kiddie Academy System and the Marks;

**WHEREAS,** Franchisee desires to enter into the business of operating a franchise pursuant to Franchisor's Kiddie Academy System and to obtain a franchise from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection with the establishment of a Kiddie Academy Child Care Learning Center and utilizing the Kiddie Academy System;

**WHEREAS,** Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, service, cleanliness, appearance, safety and commitment to the social and academic welfare of children and the necessity of operating the franchised business in conformity with Franchisor's standards and specifications;

**WHEREAS,** Franchisee represents that it, its Director and its employees will be qualified to provide child care services in a child care center in the State where the Kiddie Academy Child Care Learning Center operated by Franchisee is to be located, and is permitted by law to operate a franchise of this nature; and

**WHEREAS**, Franchisee acknowledges that it has read this Agreement and Franchisor's Uniform Franchise Offering Circular and has no knowledge of any representation by Franchisor or its officers, directors, shareholders, members, principals, affiliates, employees or agents that is contrary to the statements made in Franchisor's Uniform Franchise Offering Circular or to the terms of that Uniform Franchise Offering Circular.

**NOW, THEREFORE**, in consideration of the undertakings and commitments of each party to the other party set forth in this Agreement, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

## 1.    GRANT                                    3 Sections Follow

### Franchised Business                              1.1

Franchisor grants to Franchisee, upon the terms and conditions contained in this Agreement, the right, license and privilege, and Franchisee undertakes and accepts the obligation, to operate a Kiddie Academy Child Care Learning Center (the "Kiddie Academy Franchise" or "Franchised Business" or "academy") and to use solely in connection with the Franchised Business the Marks and the Kiddie Academy System, as they may be changed, improved and further developed from time to time by Franchisor in its sole discretion, only within the exclusive geographic territory designated below in Section 1.2.

### Protected Territory                              1.2

Franchisee is granted the right to operate the Franchised Business only at the specific location described on Exhibit A to this Agreement.  During the term of this

Agreement, Franchisor will not develop or permit anyone else to develop another academy on property that is located within Franchisee's Protected Territory. Franchisee's "Protected Territory" is hereby defined as a circle having a three (3) mile diameter, with the location of Franchisee's academy at the circle's center. If Franchisee's academy permanently ceases operations, then Franchisee's rights with respect to the Protected Territory will immediately and automatically terminate. If the Franchised Business is relocated, then Franchisee's Protected Territory will be defined as a circle having a three (3) mile diameter, with the Franchised Business as its center-point, and this new Protected Territory shall replace Franchisee's former Protected Territory.

**Rights Retained**        1.3

Franchisee expressly acknowledges and agrees that except as provided in Section 1.2 of this Agreement, the rights granted Franchisee by this Agreement are non-exclusive. Franchisor will retain the right, among others, to use, and/or to license others to use, the Kiddie Academy System and the Marks at any location, subject only to Section 1.2 above, even if those other Kiddie Academy Franchises will compete for customers within the Franchisee's Protected Territory. Franchisor reserves all rights to develop, use and license the use of proprietary marks other than the Marks in connection with the operation of a program or system that offers services which are the same as or similar to those offered under the Kiddie Academy System, on any terms and conditions as Franchisor deems advisable and without granting Franchisee any rights in those proprietary marks.

**2.**     **TERM**                                  2 Sections Follow

**Fifteen (15) Year Agreement**        2.1

Except as otherwise provided under Section 2.2 of this Agreement, this Agreement will be for a term of fifteen (15) years (the "Term"). This Agreement will become effective, and its Term will commence, on the date this Agreement is fully executed by the parties (the "Commencement Date") and will terminate on the last day of the Term. Franchisee hereby agrees to operate the Franchised Business continuously pursuant to the terms of this Agreement for the entire Term of this Agreement.

**Extension to Conform to Lease**        2.2

In all instances, Franchisee must enter into a lease for the premises of the Franchised Business, which must have an initial term of at least fifteen (15) years. In the event Franchisee enters into a lease for the location of its Kiddie Academy Franchise and such lease is of a term which commences after the Commencement Date of this Agreement so that the term of the lease will expire after the expiration date of this Agreement, then the Term of this Agreement automatically will be extended

through the termination date of the Franchisee's lease, it being the intention of Franchisor and Franchisee that this Agreement and the Franchisee's lease terminate simultaneously.

## 3.     RENEWAL                                   7 Sections Follow

Franchisee may, at its option, decide not to renew this Agreement after the conclusion of its Term.  Upon such non-renewal, applicable provisions of Sections 17 and 18 of this Agreement shall control.  Franchisee also may seek to renew this Agreement for a renewal term to be agreed to in writing by and between the Franchisor and the Franchisee (such renewal term to be a minimum of five (5) years), subject to the following conditions which must be met prior to renewal:

### Notice                                                      3.1

Franchisee must give Franchisor written notice of Franchisee's election to renew or not renew not less than twelve (12) months or more than twenty-four (24) months prior to the end of the Term, which notice will be sent in a manner set forth in Section 23 of this Agreement.

### Refurbishment                                               3.2

Franchisee, at Franchisee's expense, will renovate, restore and refurbish the Franchised Business as is reasonable and necessary to conform the Kiddie Academy Franchise to Franchisor's then-current standards and specifications, including without limitation interior and exterior design and operating specifications regarding size, colors, trade dress, presentation of the Marks, wall and floor coverings and finishes, accessories, supplies and installed equipment.

### Compliance                                                  3.3

Franchisee will not be in default of any provision of this Agreement, any amendment to or successor of this Agreement, or any other agreement between Franchisee and Franchisor or its subsidiaries and affiliates; and Franchisee will have substantially complied with all of the provisions and conditions of those agreements during the terms of those agreements.  Franchisee will have satisfied all monetary obligations owed by Franchisee to Franchisor or its subsidiaries or affiliates and will have timely met those obligations throughout the term of this Agreement.  Franchisee will comply with Franchisor's then-current qualification and training requirements.

### New Franchise Agreement                                     3.4

Franchisee (and any obligor under this Agreement or any guaranty thereof) will execute Franchisor's then-current form of renewal franchise agreement and all related addenda, in Franchisor's sole discretion, which agreement and related addenda will

supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including without limitation a higher percentage royalty fee; provided, however, that the percentage royalty fee payable during a renewal term will never be increased to a percentage which is greater than that which is then required to be paid system-wide by Franchisor's newest franchisees. Additionally, the location of the Franchised Business, as designated in this Agreement, will remain the same.

**Renewal Fee** 3.5

Franchisee will pay to Franchisor a renewal fee of Fifteen Percent (15%) of the then-current aggregate Franchise Fee payable to Franchisor by new Kiddie Academy Franchisees, which fee will compensate Franchisor for its administrative expenses and the work of its employees related to considering and granting renewal.

**Refresher Training** 3.6

Franchisee and its Director will attend and complete to Franchisor's satisfaction any refresher courses, seminars and other training programs as Franchisor may reasonably require.

**Release** 3.7

Franchisee will have executed a general release, in a form drafted by and satisfactory to Franchisor, releasing Franchisor and its predecessors and affiliates, and their respective officers, directors, shareholders, members, managers, employees, heirs, successors and assigns in their corporate and individual capacities, from any and all claims, causes of action, actions, demands, obligations, costs and expenses of every nature, character and description arising prior to and including the date of the general release, including without limitation those arising under federal, state and local laws, rules, regulations and ordinances.

**4. LOCATION OF KIDDIE ACADEMY FRANCHISE** 6 Sections Follow

**Lease or Purchase Agreement** 4.1

The form of any real property lease, lease renewal or purchase agreement for the Franchised Business must be approved in writing by Franchisor before the execution of the lease, lease renewal or purchase agreement. After the lease, lease renewal or purchase agreement is executed, it cannot be modified, amended or assigned without Franchisor's prior written consent. Franchisor's approval of the lease, lease renewal or purchase agreement will be conditioned upon the prior execution of certain agreements and the inclusion in the lease, lease renewal or purchase agreement of various provisions as Franchisor may reasonably require, in its discretion.

4.1(a)

In the event a lease or purchase contract for the Franchised Business is executed, but a contingency in the lease or purchase contract is not met and as a result, the lease or purchase contract is terminated, Franchisor will not refund any portion of either the Preliminary Agreement Fee or the Franchise License Fee paid by Franchisee. Kiddie Academy's sole obligation to Franchisee in such circumstances is to assist Franchisee, at no additional cost to Franchisee, in Franchisee's efforts to (i) locate an alternative site and (ii) negotiate a corresponding lease or purchase contract for the alternative site.

## Pre-Occupancy Inspections 4.2

Franchisee hereby grants Franchisor and its agents and assigns the right to enter and inspect the property and building that constitutes the Franchised Business prior to occupancy by the Franchisee in order to inspect, photograph or videotape on-going new construction or leasehold improvements, designs, purchased and installed equipment, operations and the performance of any and all services by Franchisee and/or Franchisee's employees, invitees or agents regarding governmental and Franchisor's requirements. Franchisee will cooperate at all times and in every manner with Franchisor's representatives in those inspections by rendering whatever assistance they may reasonably request, including assistance necessary to enable Franchisor to contact and interview any architect, designer, vendor, contractor or Academy employee. Upon reasonable notice from Franchisor, and without limiting Franchisor's other rights under this Agreement, Franchisee will take such steps as may be necessary to correct immediately any and all deficiencies detected during any such inspection, including without limitation, immediately correcting any problems with construction, leasehold improvements and equipment and supplies, and immediately desisting from the further use of any equipment, designs, advertising materials, products, child care methods or supplies that do not conform with Franchisor's then-current plans and specifications, standards or requirements.

## Collateral Assignment of Lease 4.3

Franchisee will provide the prospective lessor, at the commencement of lease discussions with such prospective lessor, a copy of Franchisor's form of Collateral Assignment of Lease and Consent and Agreement of Landlord (the "Collateral Assignment"). At the same time Franchisee and the prospective lessor enter into a lease for the premises, Franchisee, Franchisor and the prospective lessor shall also execute the Collateral Assignment. If Franchisee proposes to lease the premises from any owner, member, manager, partner, director, officer or other principal of Franchisee, or from any person related to or affiliated with Franchisee or one or more of Franchisee's owners, partners, directors, officers or other principals (an "Affiliate"), Franchisor may also require the Affiliate to sign this Agreement and/or separate agreements for the purpose of binding the Affiliate to applicable provisions of this

Agreement, as determined by Franchisor. Franchisee further agrees that if a corporation, limited liability company, partnership or other entity affiliated with Franchisee enters into a lease for the premises so that such entity becomes obligated thereon, such entity must also sign and be bound by all of the terms, obligations, covenants and conditions contained in this Agreement.

**Signs** 4.4

Franchisor will provide Franchisee with specifications and designs for signs and related accessories which will be required for the Franchised Business. Franchisee must install all signs, in and around the Franchised Business, as specified by the Franchisor and as permitted under local laws, codes and regulations. Franchisee shall purchase all original and replacement signs from a national signage company designated by Franchisor or a signage company otherwise approved in writing by Franchisor. Franchisee must submit the photographs, drawings and descriptions of all materials and samples related to the signs to Franchisor in order to determine whether such signs and related materials meet Franchisor's specifications. If any of the items installed by Franchisee or Franchisee's vendors do not meet Franchisor's specifications, Franchisee hereby agrees to immediately change and/or replace each and every such non-conforming item at Franchisee's expense so that they meet every aspect of Franchisor's specifications. If Franchisee fails and/or refuses to make such changes or to replace items that must be replaced, Franchisor shall be permitted to do so at Franchisee's expense.

**Relocation of Franchised Business and Fee** 4.5

Franchisee will operate the Franchised Business only at the location noted in Exhibit A. If the lease for the site of the Franchised Business expires or terminates through no fault of Franchisee, or if the site is destroyed, condemned or otherwise rendered unusable, or if in the judgment of Franchisor there is a change in the character of the location of the Franchised Business sufficiently detrimental to its business potential to warrant its relocation, or if in Franchisor's sole discretion a relocation of the Academy would significantly improve the Academy's business prospects, Franchisor will grant permission for relocation of the Franchised Business to a new location approved by Franchisor. The relocation will be solely at Franchisee's expense and Franchisee will be required to pay to Franchisor a relocation fee of seven thousand five hundred dollars ($7,500.00) to reimburse Franchisor for its expenses related to and arising from the relocation of the Franchised Business.

**Site Approval** 4.6

If Franchisee must find a new location for the Franchised Business as contemplated by Section 4.5, Franchisee will use its best efforts to select and purchase or lease an acceptable site for the location of the Franchised Business. Prior to the execution of any lease or purchase agreement regarding the premises for the Kiddie

Academy Franchise, Franchisee will submit to Franchisor a written proposal consisting of a description of the proposed site, a trade area study and a competition survey, each of which shall be prepared by Franchisee, utilize Franchisor's site evaluation forms and be completed in accordance with Franchisor's specifications, and a letter of intent or other evidence satisfactory to Franchisor confirming Franchisee's intent to obtain the proposed site. Franchisor will provide Franchisee notice of approval or disapproval of the proposed site within fifteen (15) days after receiving Franchisee's complete written proposal. Franchisee must first receive Franchisor's written approval of the proposed site before Franchisee may enter into a lease or purchase agreement, and the lease or purchase agreement must be approved by Franchisor prior to Franchisee signing such lease or purchase agreement in accordance with the terms of Section 4.1 above.

## 5.    DUTIES OF FRANCHISOR                     10 Sections Follow

All duties of Franchisor under this Agreement are to the Franchisee, and no other party is entitled to rely on, enforce or obtain relief for breach of any such obligation, either directly or by subrogation. Franchisor will undertake the following duties:

### Construction Oversight Assistance                     5.1

After the lease or purchase Agreement for the Franchised Business is fully executed, a representative of Franchisor will inspect the site of the Franchised Business during its construction, on dates and at times that are in Franchisor's sole discretion.

### Plans and Specifications                     5.2

Franchisor will make available, at no charge to Franchisee, one (1) set of standard plans and specifications for the Franchised Business, including general specifications for interior and exterior design, appearance, equipment, furnishings and signs. Franchisor may elect, at its option, to alter the standard plans and specifications or to provide additional plans and specifications if requested to do so by Franchisee or if such alterations or new plans and specifications are necessary to complete the project. However, any and all changes must be approved in advance by Franchisor and Franchisor reserves the right to charge Franchisee a reasonable fee to complete such alterations or additional plans and specifications or to require Franchisee to hire a designer/architect, at Franchisee's sole cost and expense, to complete any and all such alterations or new plans and specifications for the Kiddie Academy Franchise.

### Training                     5.3

Franchisor will provide training programs as set forth in Sections 8 below. The purpose of the training programs is to develop a basic working knowledge of the skills and techniques necessary to operate the Franchised Business.

## Licenses and Permits                                    5.4

Franchisor will assist Franchisee in obtaining all licenses, permits and approvals required by governmental agencies to construct and operate the Franchised Business. Ultimately, however, it is Franchisee's obligation to obtain and maintain all such licenses, permits and approvals, and all out-of-pocket costs associated with obtaining and maintaining such licenses, permits and approvals shall be borne exclusively by the Franchisee.

## Grand Opening Assistance                                5.5

Franchisor will assist Franchisee in planning and preparing for Franchisee's Grand Opening Celebration, which will occur on a date that is no more than thirty (30) days after the date on which the Franchised Business first opens.

## Operational Assistance and Inspections                  5.6

A representative of Franchisor will visit the site of Franchised Business up to three (3) times, as Franchisor deems necessary, and on dates and at times specified by Franchisor in its sole discretion, for on-site supervision and assistance during the twelve (12) months after the Kiddie Academy Franchise first opens for business. In addition, Franchisor will provide from time to time during the Term of this Agreement, as Franchisor deems appropriate, advisory assistance and materials from its corporate offices concerning the operation, promotion and management of the Franchised Business. Further, in order to maintain the high standards of quality, appearance and service of the Kiddie Academy System, Franchisor will conduct, as Franchisor deems appropriate and advisable, inspections, announced and unannounced, of the Franchised Business and shall evaluate the services rendered at the Franchised Business , as well as Franchisee's teaching staff and personnel.

## Advertising                                             5.7

Franchisor will make available to Franchisee from time to time, as Franchisor deems appropriate, advertising and promotional plans, materials and methods for local advertising and promotions as described in Section 13 of this Agreement. All advertising and promotional plans and materials must be approved in advance by the Franchisor.

## Kiddie Academy Manuals                                  5.8

Franchisor will provide Franchisee, on loan, copies of all of the current manuals used within the Kiddie Academy System, as well as the Kiddie Academy Curriculum (collectively, the "Kiddie Academy Manuals"), as more fully described in Section 10 of this Agreement. Some or all of the Kiddie Academy Manuals may be made available to

Franchisees via the Kiddie Academy Intranet System, in lieu of or in addition to paper copies of the same, at the discretion of the Franchisor.

## Supplies and Equipment and Preferred Vendors      5.9

Franchisor will provide, at no expense to Franchisee, a list of equipment and supplies, which will be updated from time to time, at the Franchisor's discretion. The lists of equipment and supplies specifies the equipment and supplies that have been approved by Franchisor and which are needed by Franchisee to open and operate the Franchised Business, as specified in Sections 6.10 and 6.11 hereof. Franchisor will supply to Franchisee, at no additional cost, a list of preferred vendors from whom equipment and supplies for the Franchised Business may be purchased. The list of equipment and supplies and the list of preferred vendors may be available on the Kiddie Academy Intranet System, at the discretion of the Franchisor.

## Business Management System      5.10

Franchisor will prescribe a business administrative support system, including computer hardware and software requirements (the "Business Management System"), which is to be procured by Franchisee (as specified in Sections 6.4, 12.1 and 12.2 hereof) and used in the operation of the Franchised Business.

## 6.    DUTIES OF FRANCHISEE      22 Sections Follow

Franchisee understands and acknowledges that in order to maintain high and uniform operating standards, increase the demand for the services offered by all Franchisees, and protect the reputation and good will of Franchisor and the Kiddie Academy System, every detail of the Franchised Business is of critical importance to the Franchisor and all Kiddie Academy Franchisees. Toward that end, Franchisee acknowledges and accepts, without limitation regarding other duties described and enumerated in this Agreement, the following duties:

## Training      6.1

Franchisee and Franchisee's Directors must attend and successfully complete all of Franchisor's required training programs as set forth in Sections 8.1 and 8.2 below.

## Service and Program Quality      6.2

Franchisee will offer all of the services and programs prescribed by the Franchisor, only those services and programs that meet Franchisor's uniform standards of quality, and only those services and programs which have been expressly approved in writing by Franchisor through the Kiddie Academy Manuals or otherwise. Franchisee will provide services only in accordance with Franchisor's methods and techniques. Franchisee will not deviate from Franchisor's standards and specifications for the

provision of services or the type or quality of programs and services provided at the Franchised Business without Franchisor's prior written consent. Franchisee will discontinue offering such services or programs, or the use of teaching methods and/or child care techniques, as Franchisor may, in its discretion, disapprove in writing at any time.

### Prices of Kiddie Academy Services                                   6.3

Franchisee will have the right to offer and sell its services at any price and will in no way be bound by any price which may be recommended or suggested by Franchisor. However, Franchisee must provide to Franchisor a price list containing all of the prices charged for the services supplied by the Franchised Business. Such price list must be updated and supplied to Franchisor every time Franchisee alters its prices and, in any event, at least annually.

### Telephone, Facsimile, Computer and Internet Connections        6.4

Franchisee will secure and at all times maintain separate business telephone lines for telephone and facsimile use at the Franchised Business as specified by Franchisor in the Kiddie Academy Manuals or otherwise. Franchisee will also secure and at all times maintain cable, DSL or other form of high speed internet connection at the Kiddie Academy Franchise as specified in the requirements for the Business Management System Software and as specified by Franchisor in the Kiddie Academy Manuals or otherwise. Franchisee will provide continuous telephone answering coverage by an employee whenever the Franchised Business is open for business. Franchisee will be solely responsible for the payment of all bills which result from the use and/or maintenance of the telephone lines and the internet connections at the Franchised Business and the operation of all computer software associated with the Business Management System. Franchisee will additionally acquire and maintain a computer system, including, at a minimum, computers at the entrance of the Franchised Business, in the Owner's office, in the Director's office and in the classroom area of the Franchised Business, as required by the Kiddie Academy Manuals, for purposes of installing and maintaining the Kiddie Academy computerized Business Management System, performing general operational functions and providing computer instruction to the children enrolled at the Kiddie Academy Franchise. The computer system shall meet or exceed the minimum requirements periodically prescribed by Franchisor, including such hardware and software as specified by Franchisor. Such requirements will be updated from time to time as deemed necessary by Franchisor in accordance with changing technology and industry standards. Franchisee shall purchase the computer system, all of the computer software associated with the Business Management System and any additional software required by Franchisor no later than fifteen (15) days after Franchisee's receipt of a permit issued by a governmental authority permitting Franchisee, Franchisee's landlord or Franchisee's developer to begin the construction/retrofitting of the site that will become the Franchised Business. Franchisee must periodically update, as required by the Franchisor and/or the software

manufacturer, all software purchased for and installed on the computer system, at the Franchisee's expense.

## Construction                                             6.5

Franchisee agrees to provide to Franchisor a copy of the Building Permit (or similar document) received by Franchisee (or its agents) relating to the construction of the Franchised Business, within three (3) business days of Franchisee's receipt of same. Franchisee will commence any required construction promptly after execution of a lease or purchase agreement for the premises of the Kiddie Academy Franchise and Franchisee (or its agents) will maintain continuous construction of the Kiddie Academy Franchise until it is ready to open. Franchisee will complete construction in accordance with the plans and specifications for the Franchised Business which have been approved in advance by Franchisor and will not deviate, except as permitted below, from such plans and specifications without the prior written consent of Franchisor. Such plans and specifications will be based upon the standard plans and specifications provided by Franchisor and the additional requirements set forth in the Kiddie Academy Manuals and as provided by Franchisor's personnel. Franchisee acknowledges that the plans and specifications provided by Franchisor are in standard form, and Franchisee or Franchisee's landlord will be required to hire, at their sole cost and expense, an architect and/or engineer to adapt and modify the plans as necessary in order to satisfy relevant building codes, child care regulations and the specific requirements of Franchisee's location, and to obtain and comply with building permits for the Franchised Business. It is Franchisee's obligation to make sure that the design and construction of the Franchised Business are in compliance with the Americans with Disabilities Act; Franchisee agrees to indemnify Franchisor against any and all claims, actions, causes of action, costs, fees, fines and penalties, of every kind and nature, should the design and/or construction of the Franchised Business fail in any way to comply with the Americans with Disabilities Act.

## Commencement of Operations                               6.6

Franchisee agrees to consistently use its best efforts under all circumstances to complete the design and construction phases of the Kiddie Academy Franchise within commercially reasonable time periods, as specified in Franchisee's lease, as agreed to by and between Franchisee and Franchisor, or as otherwise contemplated by the parties in writing, and agrees not to unreasonably delay either the design or the construction phase of the project. Franchisee further agrees to provide Franchisor with a copy of the Certificate of Occupancy (or similar document) within three (3) business days of Franchisee's receipt of same. In addition, prior to opening the Franchised Business, and after any construction, as described in Section 6.5 above, Franchisee shall execute and deliver to Franchisor an ADA Certification in the form attached to this Agreement as Exhibit B, to certify to Franchisor that the Franchised Business and its design and construction comply with the Americans with Disabilities Act.

6.6(a)

If Franchisee is entering into a contract for the purchase of an existing Kiddie Academy Franchise rather than developing a new Kiddie Academy Franchise, Franchisee will use its best efforts to take exclusive operational control and ownership /of the existing Franchised Business within thirty (30) days after execution of this Agreement, subject to all governmental approvals.

6.6(b)

If for any reason Franchisee anticipates that Franchisee will be unable to complete the design or construction phases of the Kiddie Academy Franchise within commercially reasonable time periods, despite its best efforts to do so, Franchisee must immediately provide Franchisor with written notice of that fact. In any event Franchisee must commence operations of the Franchised Business within ten (10) business days after the issuance of all governmental approvals permitting Franchisee to operate the Franchised Business.

## Licenses, Hiring, Classroom Completion          6.7

Prior to the date upon which the Franchised Business opens, Franchisee will have (i) obtained sufficient financing, if necessary, for every aspect of the Franchised Business, (ii) obtained all necessary licenses, permits and approvals, including without limitation, child care facility licenses and approvals, required by any and all pertinent governmental authorities, (iii) hired and adequately trained all necessary personnel, (iv) made all necessary leasehold improvements, (v) purchased and installed all necessary building, classroom and office equipment and supplies as required by Franchisor and as outlined in the Kiddie Academy Manuals, and (vi) obtained approval from Franchisor to open and operate the Franchised Business. If for any reason Franchisee fails to satisfy these conditions or any others required in this Agreement prior to opening the Kiddie Academy Franchise, unless precluded from doing so by war, civil disturbance, natural disaster or significant labor dispute, that failure will be considered a default and Franchisor may terminate this Agreement in its sole discretion. Upon such termination, Franchisee shall have no claim whatsoever against Franchisor but Franchisor shall retain all of its rights and claims pursuant to this agreement and otherwise.

6.7(a)

Franchisee shall place and continuously display in the lobby of the Franchised Business, in a conspicuous place, a sign or plaque designed and approved by the Franchisor that indicates that the Franchised Business in independently owned and operated as a Franchise of the Franchisor.

## Compliance with Laws 6.8

Franchisee will, at its own expense, comply with all applicable laws, ordinances and regulations of municipal, county, state or federal authorities, including without limitation compliance with all building, zoning, child care and health codes applicable to the Franchised Business, as well as the Americans with Disabilities Act.

## Hours of Operations/Holidays 6.9

Franchisee will continuously operate the Franchised Business during the entire Term of this Agreement, keeping the Franchised Business open and in normal operation Monday through Friday, from 6:30 AM through 6:30 PM (at a minimum), or for such additional minimum hours as the Franchisor may from time to time prescribe in the Kiddie Academy Manuals or otherwise in writing. Franchisee will operate the Franchised Business in conformity with the methods, standards and specifications as Franchisor may from time to time prescribe in the Kiddie Academy Manuals or otherwise in writing, to insure that the highest degree of quality and service is uniformly maintained. The Kiddie Academy Franchise shall not be closed for holidays other than those specifically prescribed from time to time by Franchisor in the Kiddie Academy Manuals or otherwise in writing.

## Conformance to Kiddie Academy Standards and 6.10
## Notification to Franchisor of Supplies and Equipment
## to be Stocked or Used in the Kiddie Academy Franchise

Franchisee agrees to purchase for use in and around Franchised Business only those new supplies and new items of equipment specified by Franchisor and described in the list of equipment and supplies. Such supplies and equipment will have never been used for any prior purpose whatsoever and must arrive at Kiddie Academy Franchise in the manufacturer's original box or carton to be opened and unpacked by the Franchisee or the supervisory personnel of the Franchised Business. Prior to ordering any item for use in or around the Franchised Business, Franchisee will notify Franchisor in writing, on the form prescribed by Franchisor, of each and every item of supply or equipment Franchisee intends to order for the Franchised Business for the purpose of informing Franchisor of the exact items which will enter the Franchised Business and to allow Franchisor the opportunity to monitor same for safety or other considerations. Within a reasonable period of time after Franchisor's receipt of Franchisee's list of proposed supplies and equipment, Franchisor will approve in writing those items Franchisee intends to purchase, with the exception of those items which are not found in Franchisor's list of equipment and supplies and those items not acceptable in a Kiddie Academy Franchise for reasons of manufacturer's recall, prior use, inappropriateness for children, toxicity, flammability or other reasons causing reasonable concern to Franchisor.

## Approved Supplies and Equipment;
## Submission of Unapproved Supplies and Equipment          6.11

Franchisee may purchase from any supplier the supplies and equipment described in Section 6.10 provided that Franchisee complies with the notification provisions set forth in Section 6.10 and provided also that the goods are those that are specified in the list of equipment and supplies. If Franchisee desires to purchase an unapproved item, Franchisee will submit to Franchisor a written request for Franchisor's approval of such item. Franchisor will have the right to have its representatives inspect the item. Franchisor reserves the right, at its option, to reinspect the equipment or product item and to revoke its approval upon any failure to continue to meet any of Franchisor's then-current criteria. Within thirty (30) days after receipt of Franchisee's request, Franchisor will approve or reject the submitted item in writing based upon its standards of safety, suitability for children, and educational or recreational value to the operation of a Kiddie Academy Franchise. Franchisee may not at any time install or operate vending or other coin operated machines at the Franchised Business, including pay telephones, without the prior written consent of the Franchisor.

## Transportation Vehicles and Drivers          6.12

Franchisee shall be responsible for ensuring that all transportation vehicles used by the Franchised Business to transport children and/or staff to and from the Franchised Business comply with all federal, state and local laws and regulations. Franchisee may purchase or lease original or used motor vehicles from any source provided that all such sources meet or exceed applicable federal, state and local standards for the purchase and sale of such vehicles. All vehicles used as part of the operations of the Franchised Business shall bear the Kiddie Academy Marks as and where specified by Franchisor, and shall be used exclusively for and in furtherance of the operations of the Franchised Business.

6.12(a)

Franchisee shall at all times during the term of this Agreement, at is sole cost and expense, maintain the interior and exterior of all transportation vehicles used by the Franchised Business in good repair, attractive appearance and sound, safe operating condition. Franchisee shall maintain a complete set of records regarding the maintenance of all such vehicles, as prescribed by the Franchisor. Franchisee shall make all necessary repairs to all such transportation vehicles and in no event shall Franchisee or any individual who is employed at or by the Franchised Business use a transportation vehicle for the Franchised Business that is not currently in good condition and repair, which imposes any safety hazard to any person, or which is not currently in compliance with all federal, state and local laws and regulations.

Each person who is authorized to drive any transportation vehicles used by the Franchised Business must have and maintain a valid and appropriate driver's license from the State in which the Franchised Business is located and shall have a driving record that is acceptable to the State, Franchisee's insurance carrier and the Franchisor, as specified from time to time in the State's regulations and/or the Kiddie Academy Manuals. No person shall drive any transportation vehicles used by the Franchised Business without first having the Franchisee verify the validity of his/her driver's license and the acceptability of his/her driving record.

## Dress Code 6.13

Franchisee shall institute and maintain a dress code for all employees of the Franchised Business as specified in the Kiddie Academy Manuals.

## Pledge of Fair Dealing 6.14

In all dealings with customers, suppliers and Franchisor, Franchisee will act according to the highest standards of honesty, integrity, fair dealing and ethical conduct.

## Kiddie Academy Franchise Maintenance and Repair 6.15

Franchisee will purchase and install in or on the premises of the Franchised Business, at Franchisee's expense, all furnishings, fixtures, signs, equipment and supplies as Franchisor may reasonably direct from time to time in the Kiddie Academy Manuals or otherwise in writing. Franchisee will not install or permit to be installed in or on the premises of the Franchised Business, without Franchisor's prior written consent, any furnishings, signs, equipment, supplies or other improvements not previously approved as meeting Franchisor's standards and specifications.

Franchisee will, throughout the Term of the Franchise, maintain the Kiddie Academy Franchise in the highest degree of repair and condition. In connection with the maintenance of the Franchised Business, Franchisee will make such additions, alterations, repairs and replacements as may be required for that purpose (but no others without Franchisor's prior written consent), including without limitation such periodic repainting, as well as repairing and replacing worn and/or obsolete signs, fences, fixtures, carpets, floors, equipment (such as children's, toys and other play and learning materials) and furnishings as Franchisor may reasonably direct.

6.15(b)

Franchisor reserves the right to require Franchisee to refurbish the premises of the Franchised Business during the Term of this Agreement, but not prior to the first five (5) years of the Term. Subsequently, at Franchisor's request, but no more than once during any five (5) year period after the first refurbishing, Franchisor reserves the right to require Franchisee to refurbish the premises, at its expense, to conform to the building design, trade dress, color schemes and presentation of the Marks in a manner consistent with the then-current image for new Kiddie Academy Franchises. Such refurbishment may include, without limitation, structural changes, installation of new materials and equipment, remodeling, redecoration and changing color schemes, and modifications to existing improvements.

6.15(c)

In the event of Franchisee's delay, refusal or failure upon Franchisor's request to make repairs or modifications to the Franchised Business, Franchisor or its agents may enter the Franchised Business without further notice and without liability for trespass or other tort, and Franchisor at its option may remove, repair and/or replace, at Franchisee's expense, any items which do not conform with Franchisor's then-current standards and specifications or which are not in conformity with Franchisee's obligation to maintain the Kiddie Academy Franchise in the highest degree of repair and condition. Any amounts expended by Franchisor in connection therewith shall be reimbursed by Franchisee, with interest beginning at Franchisor's payment of the expense at the rate of eighteen percent (18%) per annum or the maximum amount permitted by law, whichever is greater, within ten (10) days after Franchisor's submission to Franchisee of an invoice for such amounts. Should Franchisee fail to reimburse Franchisor within such ten (10) day period, Franchisor shall be authorized to collect all amounts due, including interest and a ten percent (10%) late fee, through electronic banking transfers as specified in Section 7.6 hereof.

**Operational Inspections By Governmental Authorities          6.16**

Franchisee hereby grants any and all governmental authorities having jurisdiction over the Franchised Business the right to enter and inspect the Academy pursuant to applicable statutes and regulations. Franchisee will take such steps as may be necessary to correct, as required by statute or regulation, the deficiencies detected during any such inspection. Further, Franchisee will mail, via first class mail, and send, via facsimile transmission, to Franchisor, within two (2) days of Franchisee's receipt of any report from any governmental authority regarding any such inspection, a complete copy of such report in the same form the report is issued by the governmental authority.

## Operational Inspections By Franchisor 6.17

Franchisee hereby grants Franchisor and its agents the absolute right, with or without notice, to enter the Franchised Business after the academy opens for business to view the operations of the Franchised Business during hours of operation in order to inspect, photograph or videotape on-going new construction or leasehold improvements, equipment and operations, and the performance of any and all services provided in and around the Kiddie Academy Franchise by Franchisee to insure compliance with all requirements of this Agreement. Upon receiving written notice from Franchisor of a scheduled inspection, Franchisee must be present during such inspection. Franchisee will cooperate with Franchisor's representatives in those inspections by rendering whatever assistance they may reasonably request, including assistance necessary to enable Franchisor to contact and interview contractors, as well as the Franchisee's clients and enrolled children, and former clients and former enrolled children. Upon reasonable notice from Franchisor, and without limiting Franchisor's other rights under this Agreement, Franchisee will take such steps as may be necessary to correct immediately the deficiencies detected during any such inspection, including without limitation immediately correcting any problems with construction or leasehold improvements, and immediately desisting from the further use of any equipment, advertising materials, products, child care methods or supplies that do not conform to Franchisor's then-current plans and specifications, the Kiddie Academy Manuals, or other standards or requirements, and to repair or replace anything in the Franchised Business that does not so conform. Franchisee acknowledges and agrees that any and all inspections by Franchisor and all demands made by Franchisor to correct deficiencies and conform to Franchisor's standards and specifications will not constitute a representation or warranty by Franchisor that the Franchised Business or its premises comply with applicable laws, codes, ordinances, regulations or governmental standards.

## Management of Academy 6.18

The Franchised Business will at all times be under the direct, on-premises supervision of a trained and certified Director. Franchisee shall keep Franchisor informed at all times of the identity of the Franchisee's Director and shall immediately inform Franchisor if such person tenders his/her resignation or is terminated by Franchisee. Franchisee (or if Franchisee is a corporation, partnership or limited liability company, a principal of Franchisee approved by Franchisor) must also devote adequate energy and efforts to the management and supervision of the Kiddie Academy Franchise to assure compliance with the terms of this Agreement. To fulfill this obligation, the Franchisee or a principal of the Franchisee, if the Franchisee is a corporation, partnership or limited liability company, must spend at least thirty (30) hours per week at the Franchised Business during normal business hours (Monday through Friday, 6:30 a.m. to 6:30 p.m.). In the event the Franchisee owns and operates more than one Kiddie Academy Franchise, the Franchisee or a principal of the Franchisee, if the Franchisee is a corporation, partnership or limited liability company,

must spend at least thirty (30) hours per week at one or more of the Franchisee's Franchised Businesses.

### Surveys                                                        6.19

Upon Franchisor's request, Franchisee will periodically furnish to the parents of all children enrolled in the Franchised Business survey forms prescribed by the Franchisor. Franchisor shall have the right to contact such parents directly regarding the survey forms, at its discretion.

### Harmful Business Practices Prohibited                          6.20

Franchisee will not engage in any trade practice or other activity which is harmful to the goodwill or reflects unfavorably on the reputation of Franchisee or Franchisor, the Franchised Business, the services and/or products sold at the Franchised Business, or constitutes deceptive or unfair competition or otherwise is in violation of any applicable laws.

### Crisis Situations                                              6.21

Franchisee will notify Franchisor immediately upon the occurrence of any situation that may have a material impact on the Franchisee or the Franchised Business. Franchisee shall follow all of Franchisor's policies, procedures and instructions in every such situation, including, without limitation, managing public relations and communications, as directed by the Franchisor or as specified in the Kiddie Academy Manuals.

### Annual Conference                                              6.22

Franchisee must attend Franchisor's Annual Conference at least every other year during the Term of this Agreement. Franchisee will be responsible for all expenses incurred by Franchisee and its employees in connection with attendance at the Annual Conference, including, without limitation transportation, lodging, meals and wages. Further, Franchisor shall have the right to collect a fee, to be determined solely by the Franchisor, from the Franchisee for each individual associated with Franchisee's academy who attends the Annual Conference.

### 7.    FEES                                          6 Sections Follow

### Franchise License Fee                                          7.1

In addition to the Preliminary Agreement Fee paid by Franchisee under the Preliminary Agreement previously entered into between Franchisee and Franchisor, Franchisee shall pay to Franchisor a franchise license fee of Thirty Five Thousand

Dollars ($35,000.00) (the "Franchise License Fee") on the date this Agreement is executed by the Franchisee.

## Training and Assistance Fee                                        7.2

Franchisee will also pay to Franchisor a training and initial opening assistance fee of Twenty Thousand Dollars ($20,000.00) (the "Training and Assistance Fee"). The Training and Assistance Fee is payable no later than (i) ten (10) days after Franchisee receives a permit issued by a governmental authority permitting Franchisee, Franchisee's landlord or Franchisee's developer to begin the construction/retrofitting of the site that will become the Franchised Business, (ii) the actual commencement of the construction/retrofitting of the Franchised Business, or (iii) ten (10) days before Franchisee first attends the Owner's Training Program (as described in Section 8.2 hereof), whichever occurs first.

## Fees Non-Refundable                                        7.3

The Franchise License Fee and the Training and Assistance Fee will be deemed fully earned and non-refundable upon receipt by Franchisor in consideration of administrative and other expenses incurred by Franchisor in granting this franchise, including the salaried services of its personnel, the provision of services and Manuals to Franchisee by Franchisor, and for Franchisor's lost or deferred opportunity to award franchises to others. The Franchise License Fee and the Training and Assistance Fee are not refundable to the Franchisee under any circumstances.

## Royalties                                        7.4

During the Term of this Agreement, Franchisee will pay to Franchisor each week a royalty fee equal to seven percent (7.0%) of gross revenues, as defined below, generated by the Franchised Business during the preceding week. Notwithstanding any other term, provision, obligation or covenant contained in this Agreement, including, without limitation, Sections 2.1 and 2.2 above, Franchisee shall be obligated to pay Royalties, as specified in this Section 7.4, to Franchisor for a term of no less than fifteen (15) years under this Agreement, it being the intent of the parties that the Franchisee's Franchised Business be open and operational for at least fifteen (15) years.

## Definition of Gross Revenues                                        7.5

As used in this Agreement, "Gross Revenues" means all revenues and income generated from the provision of any and all services, the sale of any and all products, and the performance of any and all other activities connected to or arising from the Franchised Business, whether for cash or credit and regardless of collection in the case of credit; provided, however, that "Gross Revenues" will not include any revenue taxes or other taxes collected from customers by Franchisee for transmittal to an appropriate taxing authority. Franchisor reserves the right to limit any discounts, offsets, credits or

deductions of any nature from Gross Revenues for the purposes of computation of Royalties and any and all other fees that are collectible under this Agreement. In all cases, the amounts of Gross Revenues generated by the Franchised Business shall be determined exclusively by the Franchisor.

**Submitting Payments; Interest On Late Payments; Late Charges**     7.6

7.6 (a)

All weekly payments required by this Section 7 and all other payments required to be made by Franchisee to Franchisor pursuant to the terms of this Agreement or otherwise will be collected by Franchisor through automatic electronic bank transfer on Monday of each week, on Gross Revenues generated during the week ended nine (9) days earlier, from Franchisee's account at the bank designated by Franchisee to Franchisor's account at the bank designated by Franchisor. Franchisee must maintain a single bank account to make all payments required by this Agreement. Franchisee must advise Franchisor at least fifteen (15) business days in advance of any change in Franchisee's bank account or financial institution; no such change will be permitted without the prior written authorization of Franchisor.

7.6(b)

If Franchisor is unable to collect any payment as anticipated by this Section 7.6 or any other payment required by this Agreement, Franchisee will pay Franchisor, in addition to the overdue amount, interest on that amount from the date the amount was due until it is paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. In addition, any such amount which is not transferred as anticipated by this Section 7.6 or any other provision of this Agreement shall bear a late charge equal to ten percent (10%) of the total payment due to cover Franchisor's costs arising from the late payment. Entitlement to such interest and late charge will be in addition to any other remedies Franchisor may have. To insure the orderly electronic transfer of the royalties and all other fees as outlined in this Section 7 and in every other Section of this Agreement, Franchisee will enter into and maintain a banking agreement with the financial institution which will be responsible for the transfer and payment of the fees owed by Franchisee to Franchisor, and a copy of that agreement will be submitted to Franchisor prior to the Commencement Date of this Agreement. Franchisee shall not withhold any payments on any grounds, including any allegations of Franchisor's non-performance.

## 8. TRAINING     6 Sections Follow

**Franchisee Training**     8.1

Franchisor will provide a training program (the "Owner's Training Program") for Franchisee (or, if Franchisee is a corporation, partnership or limited liability company,

certain designated owners, shareholders, partners, members and/or principals of Franchisee) and will make available other training programs as it deems appropriate. Franchisor shall provide the Owner's Training Program to Franchisee after Franchisee has received the building permit (or similar governmental approval) for the Franchised Business and before Franchisee receives the Certificate of Occupancy (or similar governmental approval) for the Kiddie Academy Franchise. The Owner's Training Program will be comprised of approximately four (4) weeks of instruction in management techniques and the operation of the Franchised Business. The Owner's Training Program will include on-site training at (i) one or more company-owned academies located in the State of Maryland, (ii) Franchisor's corporate offices, (iii) Franchisee's Kiddie Academy Franchise, or (iv) any other location Franchisor may specify. Franchisee (including, if Franchisee is a limited liability company ("LLC"), all members of the LLC, if Franchisee is a corporation, all shareholders of Franchisee owning or controlling at least five percent (5%) of the issued and outstanding shares of Franchisee, or if the Franchisee consists of individuals, all individual signatories of this Agreement) agrees to complete to Franchisor's satisfaction the two (2) week portion of the Owner's Training Program conducted at Franchisor's corporate offices prior to the date on which the Franchised Business first opens for business. Franchisee acknowledges and agrees that the purpose of the Owner's Training Program is to develop a basic working knowledge of the operational techniques necessary to operate the Franchised Business, including without limitation:

8.1(a)

A general knowledge of promotion, advertising and marketing techniques.

8.1(b)

A general recognition and understanding of the statutes and regulations governing child care operations in Franchisee's particular jurisdiction.

8.1(c)

The ability to assess the needs of potential clientele and market the services provided at Kiddie Academy Franchises.

8.1(d)

General office and administrative procedures, and the use of the Business Management System.

8.1(e)

The ability to acquire and utilize approved learning and educational equipment and materials.

A general understanding of the Kiddie Academy Curriculum, including the implementation and maintenance of same.

## Director's Training                                    8.2

Franchisor will provide a training program (the "Director's Training Program") for the initial Director retained by Franchisee and will make available other training programs for Franchisee's personnel as it deems appropriate. The Director's Training Program will comprise approximately five (5) business days of instruction in the day-to-day management and operation of a Kiddie Academy Franchise and will include on-site training in one or more company-owned child care center located in the State of Maryland or in any other location Franchisor may specify. Prior to Franchisee's commencement of the Franchised Business, Franchisee's initial Director must complete to Franchisor's satisfaction the Director's Training Program. Any subsequent Directors retained by Franchisee shall attend the Director's Training Program, such training to be scheduled at the convenience of Franchisor, but in any event, shall be completed within three (3) months of the date on which a newly hired Director's employment begins at the Franchised Business. Franchisor reserves the right to charge a fee for training subsequent Directors if more than one Director per year is enrolled in the Director's Training Program outside of the Franchisor's normal training schedule.

## Refresher Training and Completion                      8.3

Franchisor also may require refresher training programs for Franchisee and/or Franchisee's Director, as Franchisor deems appropriate. Franchisee and/or its Director will attend and complete to Franchisor's satisfaction any refresher courses, seminars and other training programs as Franchisor may reasonably require from time to time.

## Opening/On-Site Consultations                          8.4

After Franchisee receives a Certificate of Occupancy, Use and Occupancy Certificate or similar governmental authorization permitting Franchisee to occupy the premises of the Franchised Business, representatives of Franchisor will visit the Franchised Business to consult with Franchisee, its Director and Franchisee's initial classroom staff, concerning classroom set-ups and arrangements, initial staff orientations, on-site business management and operations instruction, and instruction regarding the Kiddie Academy Curriculum.

## Training Cost and Location                             8.5

All training contemplated by this Section 8 will be conducted at or near Franchisor's corporate offices in Bel Air, Maryland or any other location as Franchisor may specify. Franchisor will provide instructors and training materials for all required

training programs. Franchisor reserves the right to assess Franchisee a reasonable per diem training fee and collect its out of pocket expenses for (a) any refresher training programs and (b) any training programs which are provided to Franchisee or its Directors either outside of Franchisor's normal training schedule or not at Franchisor's usual training facilities. All fees to be paid by Franchisee pursuant to this Section 8.4 shall be due and payable to Franchisor upon the provision of the services contemplated herein. Franchisee will be responsible for all expenses incurred by Franchisee and its employees in connection with any and all training programs, including without limitation transportation, lodging, meals and wages.

**Employee Training** 8.6

It will be solely Franchisee's responsibility to ensure that all new employees and current employees are trained to perform their duties in a proper manner at the Kiddie Academy Franchise. Therefore, Franchisee shall implement and maintain for the entire Term of this Agreement a training program, at Franchisee's expense, for all of the employees of the Franchised Business according to specifications, standards and procedures that Franchisor will prescribe from time to time. All employees must have all certifications and credentials required by applicable state laws, licensing regulations and Franchisor, and must meet all continuing educational training requirements as may be specified by applicable laws, regulations and Franchisor. If Franchisee is unable to provide the employee training required pursuant to this Section 8.5, Franchisor may, upon receiving Franchisee's request, provide training to Franchisee's employees at Franchisor's then-current fee, plus expenses, which shall be borne by the Franchisee. Training by Franchisor will be at reasonable times and subject to availability of Franchisor's representatives. If Franchisor provides training to Franchisee's employees upon Franchisee's request, Franchisee hereby releases, indemnifies and holds harmless Franchisor and its affiliates, agents and employees from all claims, causes of action, expenses, costs, debts, liabilities and damages of every kind arising out of or related to the training and/or the continuing education of Franchisee's employees as set forth herein.

**9.  MARKS** 7 Sections Follow

**Franchisor Rights In The Marks** 9.1

Franchisor represents with respect to the Marks that Franchisor has the right to use and to license others to use the Marks. Franchisor also has taken and will take all steps reasonably necessary, in Franchisor's discretion, to preserve and protect the validity of the Marks. Franchisor will permit Franchisee and other franchisees to use the Marks only in accordance with the Kiddie Academy System and the standards and specifications attendant to the Marks which underlie the goodwill associated with and symbolized by the Marks.

## License and Use of Marks    9.2

With respect to Franchisee's licensed use of the Marks pursuant to this Agreement, Franchisee agrees that Franchisee will use only the Marks designated by Franchisor and will use them only in the manner authorized and permitted by Franchisor. Franchisee will use the Marks only for the operation of the Franchised Business or in advertising specifically used to promote the Franchised Business in the geographic region in which the Franchised Business is located. Franchisee will not use the Marks as part of its corporate or other legal name. Franchisee will not use the Marks in such a manner that leads the public to believe that Franchisee is authorized to represent or be the agent for the Franchisor, the Franchised Kiddie Academy System or the Franchisor's business. Unless otherwise authorized or required by Franchisor, Franchisee will operate and advertise the Franchised Business only under the name "Kiddie Academy" or "Kiddie Academy Child Care Learning Center."

## Protection of Marks    9.3

During the term of this Agreement and any renewal period, Franchisee will give notice that Franchisee is the owner of the Franchised Business in conjunction with any use of the Marks, including without limitation on invoices, order forms, receipts and contracts, and otherwise as Franchisor may designate in writing. The form and content of that identification will comply with standards set forth in the Kiddie Academy Manuals or as otherwise set forth in writing by Franchisor. Franchisee's right to use the Marks is limited to the uses authorized under this Agreement, and any unauthorized use of the Marks will constitute an infringement of Franchisor's rights and a breach of this Agreement. Franchisee will not use the Marks to incur any obligation or indebtedness on behalf of Franchisor. Franchisee will comply with Franchisor's instructions in filing and maintaining requisite trade name or fictitious name registrations, and will execute any documents deemed necessary by Franchisor or its legal counsel to obtain protection for the Marks or to maintain their continued validity and enforceability.

## Litigation Involving the Marks    9.4

Franchisee shall promptly notify Franchisor of any suspected unauthorized use of the Marks, any challenge to the validity of the Marks, including, without limitation, any claims or causes of action filed against the Franchisee or the Franchised Business, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Marks. Franchisee acknowledges that Franchisor has the sole right to direct and control any and all administrative proceedings or litigation involving the Marks, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks. Franchisor shall defend Franchisee against any third-party claim, suit or demand arising out of Franchisee's use of the Marks. If Franchisor, in its sole discretion, determines that Franchisee has used the Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement,

shall be borne by Franchisor. However, if Franchisor, in its sole discretion, determines that Franchisee has not used the Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne entirely by Franchisee. In the event of any litigation relating to Franchisee's use of the Marks, Franchisee shall execute any and all documents and do such acts as may, in the opinion of Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs in doing such acts.

### Acknowledgments 9.5

Franchisee expressly understands and acknowledges that as between the parties to this Agreement, Franchisor has the exclusive right and interest in and to the Marks and the goodwill associated with and symbolized by them. The Marks are valid and serve to identify the Kiddie Academy System and those who are authorized to operate pursuant to the Kiddie Academy System. Franchisee will not directly or indirectly contest the validity of the Marks or Franchisor's ownership of the Marks. Franchisee shall not attempt to register or otherwise obtain any interest in any Internet domain name or URL containing any of the Marks or any other word, name, symbol or device which is likely to cause confusion with any of the Marks. Franchisee also acknowledges that its use of the Marks pursuant to this Agreement does not give Franchisee any ownership or other interest in or to the Marks, except the license granted by this Agreement. Any and all goodwill arising from Franchisee's use of the marks in its franchise will inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license granted by this Agreement, no monetary amount will be assigned as attributable to any goodwill associated with Franchisee's use of the Kiddie Academy System or the Marks.

### Nonexclusive Grant of Marks 9.6

The right and license of the Marks granted by this Agreement to Franchisee is nonexclusive, and Franchisor has and retains the right, among others, to use the Marks in connection with selling products and performing services; to grant other licenses for the Marks in addition to those licenses already granted to existing Franchisees; and to develop and establish other systems using the same and similar Marks, or any other proprietary Marks, as well as to grant licenses or franchises to those other systems and Marks without providing any rights in those systems or Marks to Franchisee.

### Substitution of Marks 9.7

Franchisor reserves the right to substitute or add different Marks for use in identifying the Kiddie Academy System and the business operating under this Agreement if Franchisor's currently-owned Marks can no longer be used, or if

Franchisor, in its sole discretion, determines that substituting or adding different Marks will be beneficial to the Kiddie Academy System. All costs associated with and/or arising from such substitution or addition shall be borne exclusively by the Franchisee.

## 10. KIDDIE ACADEMY MANUALS 6 Sections Follow

### Operation in Conformity with Kiddie Academy Manuals 10.1

In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee will conduct all aspects of its business in accordance with the Kiddie Academy Manuals.

### Confidentiality of Kiddie Academy Manuals 10.2

Franchisee will at all times treat the Kiddie Academy Manuals (including the Kiddie Academy Manuals, for which Franchisor, through an affiliate, holds a United States copyright (# TXu 1-001-602)), any other materials created for or approved for use in the operation of the Franchised Business, and the information contained in the Kiddie Academy Manuals as confidential, and Franchisee will use all reasonable efforts to maintain that information as secret and confidential. Except as approved in writing by Franchisor, Franchisee will not at any time copy, duplicate, record, or otherwise reproduce such materials, in whole or in part, or otherwise make the materials available to any unauthorized person.

### Ownership of Kiddie Academy Manuals 10.3

The Kiddie Academy Manuals (including The Kiddie Academy Curriculum, for which Franchisor, through an affiliate, holds a United States copyright (# TXu 1-001-602)) will at all times remain solely the property of Franchisor and will at all times be kept in a secure place at the Franchised Business. Franchisee promptly will return the Kiddie Academy Manuals to Franchisor upon the expiration or other termination of this Agreement and in such case Franchisee shall not retain any copies of the Kiddie Academy Manuals or any parts or portions thereof. Franchisee shall pay to Franchisor Five Hundred Dollars ($500.00) for each and every volume of the Manuals or part thereof that is not returned to Franchisor upon the expiration or other termination of this Agreement.

### Revisions of Kiddie Academy Manuals 10.4

Franchisor may from time to time revise the contents of the Kiddie Academy Manuals (including the Kiddie Academy Curriculum) and Franchisee expressly agrees to comply with each new or revised standard or requirement. Further, Franchisee will at all times ensure that its copies of the Kiddie Academy Manuals (including the Kiddie Academy Curriculum) are kept current and up-to-date. In the event of any dispute as to the contents thereof, the terms of the master copies of the Kiddie Academy Manuals

(including the Kiddie Academy Curriculum) maintained by Franchisor at Franchisor's headquarters will be controlling.

**Manuals Located On Intranet**      10.5

Franchisor shall have the right, but not the obligation, to maintain the Kiddie Academy Manuals on the Kiddie Academy Intranet System and may do so in lieu of providing to Franchisee any hard copies thereof.

**Replacement of Manuals**      10.6

Should one or more volumes of the Manuals kept on display at the Franchised Business become lost or stolen, or, in the Franchisor's opinion, become materially damaged, unusable or destroyed, Franchisor will lend Franchisee one or more replacement volumes to the Franchisee. In Franchisor's sole discretion, Franchisee will be required to pay to Franchisor a fee of five hundred dollars ($500.00) for each such replacement volume of the Manuals provided by Franchisor.

**11. CONFIDENTIAL INFORMATION**      5 Sections Follow

**Definition**      11.1

Any and all information, knowledge, know-how, training and techniques which Franchisor designates as confidential and which is legally protectable will be deemed confidential for purposes of this Agreement.

**Prohibition**      11.2

Franchisee and all guarantors of this Agreement, personal or otherwise, will not, during the term of this Agreement or upon or after its expiration or termination, communicate, divulge, or use for the benefit of itself, its business, or any other person, persons, partnership, association, limited liability company, corporation or business, any confidential information, knowledge, know-how or training concerning the methods of administration and operation of the Franchised Business or the Franchisor which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation of the Franchised Business pursuant to this Agreement.

**Transmittal to Personnel**      11.3

Franchisee will divulge such confidential information only to personnel, if any, who must have access to it in order to operate the Franchised Business. Further, Franchisee will require all personnel having access to any confidential information from Franchisor to execute an agreement, as referenced in Section 18.10, requiring them to maintain the confidentiality of information they receive in connection with their employment at the Kiddie Academy Franchise. Those agreements will be in a form

satisfactory to Franchisor, including without limitation, specific identification of Franchisor as a third-party beneficiary of such agreements, with Franchisor having an independent right to enforce them.

## Consequences of Breach                                            11.4

Franchisee acknowledges that any failure to comply with the requirements of this Section 11 will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining monetary damages for violations of this Section 11, or an injunction against violation or specific performance of the requirements of this Section 11.

## Client Lists                                                       11.5

Franchisee shall consistently maintain a current list of the names, addresses and telephone numbers of the families enrolled and/or who have disenrolled from the Franchised Business. Franchisee shall supply such list to Franchisor and shall update such list upon request of Franchisor. Franchisee shall not disclose such information to any person or entity other than Franchisor, or sell such list(s) or any portions thereof to any person or entity.

## 12.    REPORTING AND RECORDS                          12 Sections Follow

## Business Management System                                     12.1

No later than fifteen (15) days after Franchisee's receipt of building permit or similar document issued by the appropriate governmental authority, Franchisee will purchase a customized package of computer software to be used on a daily basis to maintain information regarding the operations, enrollment and financial status of the Franchised Business and to report such information to Franchisor or its designee, as specified by Franchisor in the Kiddie Academy Manuals or otherwise (the "Customized Software"). Franchisee will also purchase and maintain annual technical support subscriptions for the Customized Software. Franchisee will be solely responsible for all costs related to and/or arising from the purchase, installation and maintenance of the Customized Software, as well as the annual technical support subscriptions for the Customized Software. Franchisee will use the Customized Software only as specified by Franchisor in the Kiddie Academy Manuals or otherwise. Franchisee will timely submit to Franchisor or its designee, as specified by Franchisor, information relating to the operations, enrollment and financial status of the Franchised Business compiled through use of the Customized Software. Such information shall be submitted to Franchisor or its designee electronically as prescribed by Franchisor in the Kiddie Academy Manuals or otherwise.

## Computer Software and Hardware Requirements 12.2

Franchisor will provide Franchisee with the computer software and hardware specifications required to operate the Customized Software. The software and hardware specifications may be upgraded from time to time, at Franchisor's option. All costs related to and/or arising from the purchase, installation, maintenance and upgrading of all computer software and hardware will be solely the responsibility of the Franchisee. Franchisee must maintain and upgrade the computer hardware and software used in the Franchised Business in accordance with and pursuant to the Kiddie Academy Manuals and any future notifications received from Franchisor, in Franchisor's discretion.

## Forms 12.3

Franchisee will use only such forms, including, without limitation, those used in and generated by the Customized Software, as are approved by Franchisor from time to time in the Kiddie Academy Manuals or otherwise in writing. Franchisee will obtain all forms specified by Franchisor and/or the Customized Software, at Franchisee's expense, from suppliers approved by Franchisor. Franchisor has the right, but not the obligation, to maintain all or a portion of such forms on the Kiddie Academy Intranet System.

## Maintenance of Records 12.4

Franchisee will record and preserve in the Customized Software personal information relating to each child enrolled at the Franchised Business, as well as daily attendance and Gross Revenues of the Franchised Business. Franchisee must maintain, during the term of this Agreement and for at least seven (7) years from the date of their preparation, full, complete and accurate books, records, accounts, tax returns and payroll records regarding and relating to the Franchised Business in accordance with generally accepted accounting principals (GAAP) and in the form and manner prescribed by Franchisor from time to time in the Kiddie Academy Manuals or otherwise.

## Business Management System Reports 12.5

As part of the Business Management System, periodically Franchisor will produce for Franchisee certain information pertaining to the Franchised Business, including, without limitation, utilization levels, fulltime equivalence levels, accounts receivable percentages and payroll percentages. Franchisor also will submit to Franchisee certain reports analyzing revenues and expenses. All such reports and information shall be referred to herein as the "Business Management System Reports."

## Payroll Service                                                    12.6

Franchisee will use a national payroll service currently designated by Franchisor, or another service approved in writing by Franchisor, at Franchisor's discretion, which will include as part of its service the impounding and payment of all employee withholding taxes payable to the Internal Revenue Service and state and local taxing authorities. Franchisee will be responsible for all charges related to the payroll service. In addition, Franchisee must submit copies of all quarterly form 941s and all proofs of payment related thereto to Franchisor within ten (10) days of the date such forms and payments are submitted to the applicable governmental agencies.

## Acknowledgment of Franchisee                                        12.7

Franchisee expressly acknowledges that Franchisor does not warrant or guarantee the accuracy or completeness of the Business Management System, nor will Franchisor be liable for any costs, expenses or damages incurred by Franchisee as a result of Franchisee's use of the Business Management System. Franchisee acknowledges that Franchisor is not responsible for the preparation of Franchisee's books and records, financial reports, tax returns or financial statements, and Franchisee agrees that the Business Management System Reports are intended to be used by Franchisee or its independent accountant, as that person may choose, to prepare Franchisee's books and records, financial reports, financial statements and tax returns.

## Weekly Reports and Financial Information                            12.8

After the Franchised Business begins to operate, Franchisee will submit to Franchisor via facsimile transmission or first class mail, no later than Monday of each week during the Term of this Agreement, all enrollment agreements, enrollment rosters, weekly marketing summary reports and other completed forms which may be required by Franchisor, which accurately reflect the Gross Revenues and other information concerning the Franchised Business during the preceding week, in accordance with the Kiddie Academy Manuals or as otherwise specified in writing from time to time by Franchisor.

## Monthly and Periodic Reports and Financial Information              12.9

After the Franchised Business begins to operate, Franchisee will deliver to Franchisor via facsimile transmission, first class mail, postage-prepaid, or electronically, no later than the tenth (10th) day of each month during the Term of this Agreement, copies of all bank statements pertaining to the Franchised Business, as well as copies of all required financial reports pertaining to Franchisee and/or the operation of the Franchised Business, as required by the Kiddie Academy Manuals or as otherwise specified in writing from time to time by Franchisor. If Franchisee prepares and submits to Franchisor monthly profit and loss statements, Franchisor may require Franchisee to have a certified public accountant review such statements on a quarterly basis, the

expense of which shall be borne entirely by the Franchisee, and then submit such quarterly reviews to the Franchisor. Franchisee also shall immediately notify Franchisor in writing when one or more liens or judgments are filed against the Franchisee, the Franchised Business and/or any of the personal guarantors (if any) under this Agreement.

## Annual Tax Returns and Financial Statements      12.10

Franchisee will deliver to Franchisor a copy of its signed annual state and federal income tax return(s) and any amended state and/or federal income tax return on the same date they are submitted to the Internal Revenue Service. Franchisee shall also submit, within sixty (60) days following the close of business of Franchisee's fiscal year, copies of a balance sheet, profit and loss statement and cash flow report prepared and certified by a certified public accountant which cover the previous twelve (12) months of operations of the Franchised Business.

## Other Reports Required by Franchisor      12.11

Franchisee will submit to Franchisor, in addition to the Business Management System Reports, such forms, reports, records, information and data as Franchisor may reasonably designate, including, without limitation, all documents concerning any and all debts incurred by the Franchisee, Franchisee's principals and the personal guarantors hereof, if any, related to and/or arising from the Franchised Business, in the form and at the times and places reasonably required by Franchisor.

## Franchisor's Right to Audit      12.12(a)

From the date this Agreement is signed by the parties until three (3) years following the expiration or termination of this Agreement, Franchisor or its designated agents will have the right, at all reasonable times upon forty-eight (48) hours' prior notice to Franchisee, to examine and copy, at Franchisor's expense, the books, records and tax returns of Franchisee and of the Franchised Business. Franchisor also will have the right, at any time, at Franchisor's expense, to have an independent audit made of the books and records of the Franchised Business. Franchisee will cooperate fully with Franchisor and/or its representatives and independent auditors in connection with an audit or inspection, should one be conducted. If an inspection reveals that any payments have been understated in any report to Franchisor, Franchisee immediately will pay to Franchisor upon demand the amount understated, plus interest on such amount from the date such amount was due until paid at an interest rate which is two (2) points above the prime rate as published in the Wall Street Journal on the date payment was due (or, if the due date was not a business day, the next business day that follows), or the maximum rate permitted by law, whichever is less, calculated on a daily basis. Further, if an inspection discloses an understatement in any payments made to Franchisor from Franchisee of an amount that is three percent (3%) or more of the amount owed, in addition to the collection of interest on such amount(s) as

described above, Franchisee shall pay to Franchisor a fee equal to Ten Thousand Dollars ($10,000.00) or the actual cost of the audit, whichever sum is greater. All amounts owed to Franchisor under this sub-paragraph shall be collected by the Franchisor, at Franchisor's option, via electronic bank transfer as provided for in Section 7.6 of this Agreement. These remedies will be in addition to any other remedies Franchisor may have at law, equity or otherwise.

**Franchisee's Failure to Comply**  12.12(b)

During the Term of this Agreement, if Franchisee fails and/or refuses to comply with the provisions of this Section 12, including, without limitation, (1) using the Customized Software on a daily basis as part of the Franchised Business, (2) maintaining full, complete and accurate books, records and accounts regarding the Franchised Business in accordance with GAAP, and (3) transmitting to Franchisor on a timely basis all weekly and monthly reports and other financial information as required by Franchisor, as well as annual state and federal tax returns, in addition to the remedies specified in Section 12.12(a) hereof, Franchisor shall have the right to collect from the Franchisee a late fee in the amount of Five Hundred Dollars ($500.00) for each and every such failure and/or refusal to comply and for each and every repeat failure and refusal to comply with this Section 12.12(b). All such fees shall be collected by Franchisor, at Franchisor's option, via electronic banking transfer as provided for in Section 7.6 of this Agreement.

## 13.  ADVERTISING  <span style="float:right">7 Sections Follow</span>

Recognizing the value of advertising, marketing and public relations, and the importance of the standardization of advertising, marketing and promotional programs to the furtherance of the goodwill and public image of the Kiddie Academy System, the parties agree as follows:

**Advertising Expenditures**  13.1

During the term of this Agreement, Franchisee will make expenditures for advertising, marketing, public relations and promotions as follows:

13.1(a)

During the period commencing approximately one hundred and eighty (180) days prior to the date Franchisee initially opens the Franchised Business and ending on the date of Franchisee's Grand Opening Celebration (see immediately below), Franchisee will conduct a "Start-Up Advertising Promotion" consisting of an initial advertising and marketing plan for the academy that specifies the types and timing of the marketing and advertising to be completed, and which shall be approved by Franchisor. In addition, no more than thirty (30) days after the date Franchisee initially opens the Franchised Business, Franchisee will conduct a "Grand Opening Celebration," consisting of

materials and events that also have been approved by Franchisor. The combined cost of the Start-Up Advertising Promotion and the Grand Opening Celebration shall be at least Thirty Thousand Dollars ($30,000.00), which cost shall be borne entirely by the Franchisee.

13.1(b)

Franchisee agrees to aggressively advertise, market and promote the Franchised Business on a local basis. Accordingly, Franchisee agrees to use its best efforts to promote the Franchised Business through local advertising, marketing and promotional programs. Accordingly, during the Term of this Agreement, Franchisee will spend each year an amount equal to at least two percent (2%) of the Gross Revenues generated by the Franchised Business, as that term is defined in Section 7.5 above, on local and community-based advertising and marketing programs that are specific to the Franchised Business (the "Annual Advertising Expense"). The Annual Advertising Expense shall be paid by Franchisee according to an advertising and promotional plan and schedule prescribed annually by the Franchisor in the Kiddie Academy Manuals. In any event, Franchisee shall spend no less than Ten Thousand Dollars ($10,000.00) during each calendar year of the Term of this Agreement on the Annual Advertising Expense.

13.1(c)

Franchisee will at all times maintain a Business Telephone Directory advertisement in accordance with Franchisor's specifications as described in the Kiddie Academy Manuals. Franchisee will use a national vendor currently designated by Franchisor, or another service approved in writing by Franchisor, at Franchisor's discretion, to place and maintain Franchisee's Business Telephone Directory advertisement. Franchisor must approve all Business Telephone Directory advertisements, as well as all advertisements appearing for the Franchised Business on the Internet, World Wide Web and other electronic media prior to their publication. Franchisee may share with other Kiddie Academy Franchisees Business Telephone Directory and electronic advertisements in areas in which multiple Franchised Businesses are able to be included in the same advertisement. If more than one Franchisee shares the Business Telephone Directory and/or electronic advertising, the cost will be pro-rated among all participating Kiddie Academy Franchises.

13.1(d)

The Start-Up Advertising Promotion, Grand Opening Celebration, Annual Advertising Expense, classified employee recruitment advertising, Business Telephone Directory advertisements and the Advertising Fund (as described in Section 13.6 below) are separate obligations to be paid by the Franchisee. Franchisee will submit to Franchisor proof of all expenditures for the Start-Up Advertising Promotion, Grand Opening Celebration, Annual Advertising Expense and Business Telephone Directory

advertisements, which will include, without limitation, all invoices, contracts and canceled checks documenting the expenses incurred in satisfying each requirement.

## Approval of Franchisor 13.2

All advertising, marketing, public relations and promotional materials and methods that Franchisee proposes to use in connection with the Franchised Business must be approved in advance by the Franchisor. Franchisor shall have the right to modify provisions of this Section 13.2 relating to Websites as Franchisor shall solely determine is necessary or appropriate for the Kiddie Academy Franchise System.

## Franchisee Websites 13.2(a)

Franchisee will not, directly or indirectly, establish or operate a website or web page that in any way concerns, discusses or alludes to the Franchisor, the Kiddie Academy System or the Franchisee's Franchised Business. In no event will the Marks be used as part of or in conjunction with any domain names or Internet addresses, unless specifically approved by the Franchisor. Franchisee shall not establish or permit or aid anyone else to establish any links to any website or any other electronic or computer generated advertising or communication arrangement which Franchisor may create. Franchisee specifically acknowledges and agrees that any website (as defined below) will be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under Section 13.3 below. As used in this Agreement, the terms "website" and "web page" mean, collectively, an interactive electronic document, series of symbols, or otherwise, contained in a network of computers and/or other devices linked by communications software. The terms "website" and "webpage" include, but are not limited to, the Internet and World Wide Web.

## Franchisor Website 13.2(b)

Franchisor shall have the right, but not the obligation, to establish and maintain a Website, which may, without limitation, promote the Marks, or any or all of the Franchised Businesses within the Kiddie Academy System. Franchisor shall have the sole right to control all aspects of the Website, including without limitation its design, content, functionality, links to other websites, legal notices, and policies and terms of usage. Franchisor shall also have the right to discontinue operation of the Website at any time without notice to Franchisee.

## Submission of Advertising Samples and Approval Procedure 13.3

All advertising and promotions by Franchisee in any manner or medium will be conducted in an appropriate manner and will conform to such standards and requirements as are specified by Franchisor and in accordance with the Kiddie Academy Manuals. Franchisee will submit to Franchisor for its prior approval (except

with respect to prices to be charged), in the manner set forth in Section 23 of this Agreement, samples of all advertising and promotional plans and materials that Franchisee desires to use. If Franchisee does not receive written disapproval of those samples and/or materials from Franchisor within thirty (30) days of the date of receipt by Franchisor of those samples and/or materials, Franchisor will be deemed to have given the required approval. Franchisee will not use any advertising or promotional plans or materials that Franchisor has disapproved. Franchisee will display the Marks in the manner prescribed by Franchisor in the Kiddie Academy Manuals or otherwise in writing on all signs and all other advertising and promotional materials used in connection with the Franchised Business.

### Advertising Materials Provided by Franchisor 13.4

Franchisor will, from time to time, offer to provide to Franchisee such approved advertising and promotional plans and materials as Franchisor deems advisable. Franchisor expressly disclaims and Franchisee hereby acknowledges that Franchisee has not received or relied upon any warranty regarding the success of any advertising and/or promotional plans recommended by Franchisor for use by Franchisee.

### Compliance with Laws 13.5

Franchisee will solely be responsible for compliance with all relevant local, state and federal laws which apply to advertising and promotional plans and materials used by Franchisee, whether approved and/or provided by Franchisor or not.

### Advertising and Brand Building Fund 13.6

Franchisor has established an advertising and brand building fund (the "Advertising Fund") to be used for all or portions of the Kiddie Academy System. Franchisee shall contribute to the Advertising Fund on a weekly basis in an amount equal to two percent (2%) of Franchisee's Gross Revenues, as defined in Section 7.5 of this Agreement, generated during the week ending nine (9) days earlier. All contributions to the Advertising Fund shall be collected by Franchisor or an affiliate of Franchisor through automatic electronic bank transfer as specified in Section 7.6 of this Agreement. Franchisee acknowledges that the Advertising Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Advertising Fund or the monies therein. The Advertising Fund shall be maintained and administered as follows:

13.6(a)

Franchisor and its designees shall have complete and absolute control of all advertising, promotional and brand building programs and shall have absolute discretion over all creative concepts, materials, media, placement and locations of such programs. Franchisee agrees to participate in all national and local and regional advertising,

promotional and brand building programs as Franchisor determines to be appropriate and most effective for the benefit of the Kiddie Academy System. Franchisee acknowledges and agrees that the Advertising Fund is intended to maximize general public recognition and acceptance of the Marks, the Kiddie Academy brand and the services provided at Kiddie Academy Franchises for the benefit of all or a portion of the Kiddie Academy System, and that Franchisor and its affiliates and designees will undertake no obligation in maintaining and administering the Advertising Fund in such manner to make expenditures for Franchisee which are equivalent or proportionate to its contribution to the Advertising fund, or to insure that any particular Franchisee or Kiddie Academy Franchise benefits directly or pro-rata from the placement of that advertising. Franchisor reserves the right, in its sole discretion, to determine the composition of all geographic territories and market areas for the development and/or implementation of advertising, marketing, public relations and promotional programs.

13.6(b)

Franchisor or an affiliate of Franchisor will make periodic contributions to the Advertising Fund for each of the non-franchised (company-owned) academies equal to two percent (2%) of each academy's Gross Revenues.

13.6(c)

Franchisee acknowledges and agrees that the Advertising Fund may be used by Franchisor or its designees to meet any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the costs of designing, developing, preparing and conducting advertising and promotions via radio, television, newspaper, magazine, direct mail and internet advertising campaigns and other public relations and marketing activities; market research activities; employing advertising agencies to assist with, design and/or implement such campaigns and activities; and providing franchisees and prospective franchisees with promotional brochures and other marketing materials). All sums paid by the Franchisee to the Advertising Fund shall be maintained in an account that is separate and apart from other accounts in which Franchisor keeps other sums. Up to Ten Percent (10%) of the sums paid to the Advertising Fund may be used to defray any or all of Franchisor's general operating and/or overhead expenses, including such reasonable administrative costs and overhead, if any, as Franchisor may incur in activities reasonably related to the administration, maintenance and direction of the Advertising Fund and advertising campaigns/programs, including, without limitation, collecting and accounting for assessments for the Advertising Fund.

13.6(d)

A report for the Advertising Fund will be prepared annually by an independent, certified public accountant selected by Franchisor, which will be available within ninety

(90) days of the end of Franchisor's fiscal year, and which will be made available to Franchisee upon written request.

13.6(e)

Although the Advertising Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Advertising Fund at any time, in its sole discretion. The Advertising fund will not be terminated, however, until all of the monies in the Advertising Fund have been expended on advertising, marketing or promotional purposes, the administration, maintenance or direction of the Advertising Fund, or returned to contributors on the basis of their respective contributions.

### Cooperative Advertising 13.7

From time to time Franchisor may designate a local, regional or national advertising, promotional and brand awareness coverage area in which Franchisee's Franchised Business and at least one (1) other Kiddie Academy Franchise is located, for the purpose of developing a cooperative local or regional advertising, promotional or brand awareness program. Franchisee agrees to participate in and contribute its share to such program in Franchisee's coverage area(s). The cost of the program shall be allocated among Franchisees located in such coverage area(s) and each Franchisee's share shall be in proportion to its Gross Revenues, as defined in Section 7.5 of this Agreement, during the preceding twelve (12) month period or portion of such period, but the aggregate of each Franchisee's contribution during the period of the program shall not exceed one percent (1%) of Franchisee's Gross Revenues during such period. Contributions by Franchisee to cooperative advertising, promotional and brand awareness programs under this Section 13.7 shall be credited toward the Annual Advertising Expense specified in Section 13.1(b) above so that all contributions by Franchisee to cooperative advertising, promotional and brand awareness programs under this Section 13.7 shall be a part of and not in addition to the Annual Advertising Expense. Should the individual Franchisees subject to and individual cooperative advertising, promotional and brand awareness program be unable to agree with regard to the required expenditures of the program, Franchisor shall have the right to determine the amount and form of the expenditures to be made on account of such program. In addition, nothing contained in this Section 13.7 shall in any way limit or supersede any obligation on the Franchisee's part to contribute to a local, regional or other cooperative advertising program not covered by this Section 13.7 of which such Franchisee is a part.

### 14. INSURANCE 5 Sections Follow

### Requirement 14.1

Franchisee will procure, no later than thirty (30) days before the date on which the Franchised Business commences operations, and maintain in full force and effect at

all times during the Term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor, and their respective affiliates, principals, officers, directors, shareholders, partners, members and employees, against any demand, claim or cause of action with respect to personal injury, death, property damage, business interruption, intentional tort or any loss, liability, cost, debt, expense or obligation whatsoever arising or occurring upon or in connection with the Franchised Business.

**Minimum Coverage** 14.2

Such policy or policies will be written by an insurance company satisfactory to Franchisor in accordance with standards and specifications set forth in the Kiddie Academy Manuals or otherwise in writing, which company will have a rating of no less than A from the Alfred M. Best Company, Inc. and will name Franchisor as an additional insured in each such policy or policies, and will include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified by Franchisor from time to time, and Franchisee will comply with such additional coverage and higher policy limits within thirty (30) days of written notice from Franchisor), the following:

14.2(a)

Comprehensive general liability insurance, including personal injury, errors and omissions, products/completed operations, contractual liability, teachers professional liability, sexual abuse and molestation and products liability, as well as comprehensive automobile liability coverage for both owned and non-owned vehicles, and property damage liability coverage, in the amount of Two Million Dollars ($2,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) in the aggregate.

14.2(b)

All risk insurance, including theft insurance coverage with primary and excess limits of not less than the full repair and replacement value of the Franchised Business, including all improvements, fixtures, equipment and supplies therein and thereon.

14.2(c)

Student accident/medical insurance coverage.

14.2(d)

Employer's liability, workers' compensation, business interruption and such other insurance as may be required by statute or rule of the state or locality in which the Franchised Business is located and operated.

14.2(e)

Such additional insurance and types of coverage as may be required under the terms of any lease for the Franchised Business, or as may be required by the Franchisor.

14.2(f)

The insurance policy or policies Franchisee shall maintain pursuant to this Section 14 shall be commercially reasonable and shall be comparable to the insurance generally maintained within the child care industry, as determined by Franchisor.

## Effect of Insurance Coverage                                           14.3

Franchisee's obligation to obtain and maintain the policy or policies of insurance in the amounts specified from time to time will not be limited in any way by reason of any insurance which may be maintained by Franchisor, and Franchisee's performance of that obligation will not relieve it of liability under the indemnity provisions set forth in Section 20 of this Agreement.

## Certificates of Insurance                                              14.4

At least thirty (30) days prior to the time any insurance is first required to be carried by Franchisee, and at least thirty (30) days prior to the expiration of any such policy, Franchisee will deliver to Franchisor Certificates of Insurance evidencing the proper coverage with limits not less than those required by this Agreement. All Certificates will expressly provide that at least thirty (30) days prior written notice will be given to Franchisor in the event of any material alteration to, or cancellation of, the coverage evidenced by the Certificates of Insurance.

## Franchisor's Remedy Upon Franchisee's Failure to Insure               14.5

Should Franchisee for any reason fail to procure or maintain the insurance required by this Agreement, as those requirements may be revised from time to time by Franchisor in the Kiddie Academy Manuals or otherwise in writing, Franchisor will have the right and authority (without, however, any obligation to do so) immediately to procure that insurance and to charge the amount of the cost to procure that insurance to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in procuring the insurance, will be payable by Franchisee immediately upon notice. Franchisor is authorized to collect from Franchisee all insurance related expenses paid on behalf of Franchisee through automatic electronic bank transfers as provided for in Section 7.6 of this Agreement. These remedies are in addition to any other remedies at law, equity or otherwise to which Franchisor may be entitled.

## 15. TRANSFER OF INTEREST

13 Sections Follow

### Transfer by Franchisor 15.1

Franchisor will have the right to transfer or assign all or any portion of its rights and obligations established by this Agreement to any person or legal entity. If the Franchisor's assignee assumes all of the obligations of Franchisor under this Agreement and sends written notice of the assignment so attesting, Franchisee will promptly execute a general release, in a form satisfactory to Franchisor, releasing Franchisor and its affiliates, predecessors and assigns, and their respective members, managers, officers, directors, shareholders and employees, in their corporate and individual capacities, from any and all claims, causes of action, demands, debts, liabilities, obligations, costs and expenses, including without limitation claims and causes of action arising under federal, state and local laws, rules, regulations and ordinances, arising prior to and including the date the assignment of the Franchisor's obligations under this Agreement becomes effective.

### Transfer by Franchisee 15.2

Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has entered into this Agreement in reliance on the business skill, aptitude, financial capacity and personal character of Franchisee and Franchisee's principals, if any. Thus, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in the Franchised Business or the Franchisee, nor any individual, partnership, corporation or other legal entity which directly or indirectly owns any interest in the Franchised Business or Franchisee, will transfer any direct or indirect interest in the Franchised Business or Franchisee (including any direct or indirect interest in a corporation, partnership or limited liability company which has an interest in the Franchisee) without the prior written consent of Franchisor. In addition, Franchisor's consent to any proposed transfer will not be provided, if it is to be provided, unless Franchisee provides Franchisor with at least thirty (30) days advanced written notice of any proposed transfer. For purposes of this Agreement, the term "transfer" includes all of the following: selling, assigning, transferring, conveying, giving away, pledging, mortgaging or otherwise encumbering the Franchised Business, the Franchisee or any portion or part thereof. Any purported transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section, will be null and void and of no legal effect, and will constitute a material breach of this Agreement for which Franchisor may then terminate this Agreement without providing the opportunity to cure as otherwise provided by Section 16.2 of this Agreement. Such termination will have no effect whatsoever on Franchisor's right to enforce its other legal and equitable rights under this provision or otherwise.

## Conditions of Transfer by Franchisee 15.3

Franchisor will not unreasonably withhold its consent to a transfer of any interest in the Franchised Business or the Franchisee. If a transfer, alone or together with other previous, simultaneous or proposed transfers would have the effect of transferring a controlling interest in the Franchised Business or the Franchisee, however, Franchisor may, in its sole discretion, require any or all of the following, without limitation, as conditions of its approval:

15.3(a)

All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor or its affiliates, and all other outstanding obligations incurred in connection with the Franchised Business, including without limitation to suppliers, employees and landlords, will have been satisfied. Franchisor may conduct an investigation and audit pursuant to Section 12.12, at Franchisee's expense, in order to determine the extent of any accrued obligations.

15.3(b)

Franchisee and all affiliates of the Franchisee will not be in default of any provision of this Agreement, any amendment to or successor of this Agreement, any other agreement between Franchisee and Franchisor or one or more of its affiliates, or any lease entered into for the premises of the Franchised Business.

15.3(c)

The person or persons from whom the Franchisee and/or Franchised Business is to be transferred ("Transferor") and all of the personal guarantors of this Agreement, if any, will have executed a general release, in a form that has been drafted by and which is satisfactory to Franchisor, releasing Franchisor and its affiliates, predecessors, successors and assigns, and their respective members, managers, officers, directors, shareholders and employees, in their corporate and individual capacities, from any and all claims, causes of action, demands, debts, liabilities, obligations, costs and expenses, including without limitation, claims and causes of action arising under federal, state and local laws, rules, regulations and ordinances, arising prior to and including the date the transfer becomes effective.

15.3(d)

Within the time specified by Franchisor, the Transferor, at its expense, shall refurbish the Franchised Business, as necessary, to conform the Franchised Business to Franchisor's then-current standards and specifications, including, without limitation, specifications regarding, size, color, trade dress, presentation of the Marks, fixtures, educational materials, flooring, carpeting, installed equipment and outdoor play areas.

15.3(e)

The Transferee, or if the Transferee is a corporation, partnership or limited liability company, a principal of Transferee will demonstrate to Franchisor's satisfaction that the Transferee meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the Franchised Business as may be evidenced by prior related business experience or otherwise; and has adequate financial resources and capital to operate the Franchised Business.

15.3(f)

The Transferee, including all members, managers, shareholders, officers, directors and partners of the Transferee, will execute, for a term ending on the expiration date of this Agreement or for another term as prescribed by the Franchisor, and with such renewal term(s) as may be provided by this Agreement or as otherwise prescribed by the Franchisor, the standard form franchise agreement then being offered to new franchisees and such other ancillary agreements as Franchisor may require for the Franchised Business, the terms of which agreements may differ from the terms of this Agreement, including without limitation a higher percentage royalty rate, higher fees, and/or a different Annual Advertising Expense; provided, however, that the royalty rate payable by the Transferee will not be increased to an amount which is greater than that which is required to be paid system-wide by Franchisor's new franchisees, the Transferee will not be required to pay an additional Franchise Fee and the Protected Territory of the Franchised Business, as designated in this Agreement, will remain the same.

15.3(g)

At the Transferee's expense, the Transferee must satisfy all applicable child care licensing requirements of the municipality, county and State in which the Franchised Business is located and attend a Discovery Day at Franchisor's Corporate Offices prior to the date the transfer becomes final.

15.3(h)

Within the time specified by Franchisor, the Transferee shall commit in writing to the Franchisor to complete all of Franchisor's Owner's Training Programs, as specified in Section 8.1 of this Agreement, to Franchisor's satisfaction, and shall pay to Franchisor the Training and Assistance Fee specified in the then current version of the Franchise Agreement.

15.3(i)

Franchisee will remain liable for all of the obligations to Franchisor in connection with the Franchised Business prior to the date on which the transfer becomes final and will execute any and all instruments reasonably requested by Franchisor to evidence such liability. In addition, Franchisee shall continue to be bound by the agreements and covenants set forth in Sections 10.2, 11.2 and Sections 18.3 through 18.9 (inclusive) of this Agreement, which agreements shall survive any transfer or assignment of this Agreement and/or the Franchised Business.

15.3(j)

Except in the case of a transfer to a corporation or limited liability company formed solely for the convenience of ownership, Transferor shall pay to Franchisor on the date of the transfer a transfer fee of Twenty-Five Thousand Dollars ($25,000.00) to reimburse Franchisor for its reasonable costs and expenses incurred in connection with the proposed transfer and training of the Transferee.

15.3(k)

In addition, if Franchisor locates the Transferee and refers the Transferee to the Franchisee, Franchisee will pay Franchisor an amount equal to six percent (6%) of the gross sales price of the Franchised Business ("Referral Fee"). If the Franchisee sells the Franchised Business to an existing or former Kiddie Academy Franchisee, a Director of an existing Kiddie Academy Franchise or an Applicant under a Kiddie Academy Preliminary Agreement, the Franchisee must pay to the Franchisor the Referral Fee. In addition, all costs of advertising the sale of the Franchised Business will be the responsibility of Franchisee.

15.3(l)

Franchisee acknowledges and agrees that each condition which must be met by the Transferee is necessary to assure the Transferee's full performance of the obligations under this Agreement.

15.3(m)

Franchisee shall provide to the Franchisor, at Franchisee's expense, a current and complete lien search showing all (if any) judgments and/or liens that have been filed against the Franchisee, the Franchised Business and/or the individual guarantors of the Franchise Agreement.

## Transfer By Franchisee For Convenience          15.4

Franchisee may transfer its interest under this Agreement to a corporation, limited liability company or other legal entity so long as: (1) the legal entity is owned entirely by all of the original individual franchisees or personal guarantors hereof; (2) each and all of the obligations of the Franchisee are personally guaranteed by all of the original individual franchisees or personal guarantors hereof; (3) Franchisor receives prior written notice of the transfer along with a complete set of Applicant's corporate charter documents; and (4) the Franchisee and Transferee enter into a written Assignment and Assumption Agreement in a form prescribed by Franchisor pursuant to which the Transferee assumes and agrees to discharge all of Franchisee's obligations under this Agreement.

## Communications With Proposed Transferee          15.5

Franchisee hereby agrees that Franchisor may communicate with any prospective buyer of the Franchised Business regarding the business operations, financial condition, contracts and history of the Franchised Business under Franchisee's ownership without liability of any kind to Franchisor or its subsidiaries, parents, affiliates, principals, officers, directors, members, managers, agents or employees regarding such communications and/or related documents.

## Right of First Refusal          15.6

Any party holding any interest in the Franchisee or the Franchised Business who desires to accept any bona fide offer from a third party to purchase that interest will notify Franchisor in writing of each offer immediately upon receipt thereof and will provide Franchisor with the information and documentation relating to the offer that Franchisor may require. Franchisor will have the right and option, exercisable within sixty (60) days after receipt of the written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor elects to purchase the seller's interest, closing on that purchase must occur within ninety (90) days from the date of notice to the seller of the election to purchase by Franchisor. Any material change in the terms of any offer prior to closing will constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this subsection will not constitute a waiver of any other provision of this Agreement with respect to a proposed transfer.

## Appraisal of Third Party Offer          15.7

In the event the form of consideration, or the terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same form of consideration, on the same terms and/or conditions, Franchisor may purchase the interest in the Franchisee or Franchised Business proposed to be sold for the

reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the cash consideration, an independent appraiser will be designated jointly by Franchisee and Franchisor, the costs of whom shall be shared equally, and the appraiser's determination will be binding.

**Acceptance of Offer by Franchisee**    15.8

If Franchisor does not exercise the right of first refusal set forth in Section 15.6, the offer may be accepted by Franchisee, subject to the prior written approval of Franchisor, as provided for in this Section 15. If any such proposed transfer is not consummated within ninety (90) days of the date of the initial written offer, Franchisor will again have the right of first refusal as described in Section 15.6. Any transferee will also be subject to Franchisor's right of first refusal set forth in Section 15.6.

**Transfer Upon Death or Mental Incompetency**    15.9

Upon the death or mental incompetency of any person with an interest in the Franchisee or Franchised Business, the guardian, executor, administrator or personal representative of that person's estate must transfer the interest to a third party approved by Franchisor within nine (9) months after the date of death or determination of mental incompetency.

**Transfer to Heir**    15.10

In the case of a death, if the heir or successor wants to retain the decedent's interest in the Franchised Business, the heir or successor must promptly apply to Franchisor for that right for the duration of the term of this Agreement and any renewals of this Agreement. Franchisor will approve that application upon the fulfillment of all of the conditions for a transfer set forth in Section 15.3 of this Agreement, except that no transfer fee will be required. If a proper and timely application is filed and rejected by Franchisor, the nine (9) month period stated in Section 15.9 will be extended by the amount of time between the date of death and the date of the notice of rejection. The successor or personal representative must sell, assign, transfer or convey a decedent's interest in the Franchised Business in compliance with the provisions of this Section 15 in the case of a death where no heir or successor wants to retain that interest, or when it is the Franchisor's judgment that the heir(s) or successor(s) is (are) clearly unable to meet the conditions of Section 15.3 (e.g., because the heir is a minor).

**Transfer for Mental Incompetency**    15.11

In the case of a determination of mental incompetency of the Franchisee or of any individual holding an interest in the Franchisee, the duly appointed guardian must promptly decide whether to retain the interest in the Franchised Business and, if necessary, select a qualified manager to direct its operation. The guardian may then apply to Franchisor for the right to retain that interest for the duration of the term of this

Agreement and any renewals of this Agreement. Franchisor will approve that application upon the fulfillment of all of the conditions for a transfer set forth in Section 15.3 of this Agreement, except that no transfer fee will be required. The nine (9) month period stated in Section 15.9 will not be extended, whether or not the guardian applies for a right to retain the interest in the Franchisee or the Franchised Business.

## Termination After Nine Months                    15.12

If the interest in the Franchise Business is not transferred, sold, assigned or conveyed within the nine (9) month period stated in Section 15.9 (as possibly extended by Section 15.10), Franchisor may terminate this Agreement and upon such termination may avail itself of all rights conferred upon Franchisor as specified in this Agreement.

## Non-Waiver of Claims                    15.13

Franchisor's consent to a transfer of any interest in the Franchisee or the Franchised Business granted through this Agreement will not constitute a waiver of any claims it may have against the transferring party, nor will it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

## 16.    DEFAULT AND TERMINATION                    5 Sections Follow

## Termination Upon Notice                    16.1

Upon the occurrence of any of the following events, each of which Franchisee and all personal guarantors of this Agreement hereby agree shall constitute "good cause" for termination of this Agreement, Franchisee will be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted under this Agreement without affording Franchisee any opportunity to cure the default. Said termination will be effective immediately upon Franchisee's receipt of notice from Franchisor of termination, or, in any event, within five (5) business days from the date on which such notice is mailed, if:

16.1(a)

Franchisee at any time ceases to operate or otherwise abandons the Franchised Business, or loses the right to possession of the Franchised Business, or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchised Business is located; provided, however, that if any such loss of possession results through no fault of Franchisee, and the Franchised Business is damaged or destroyed, then Franchisee will have thirty (30) days after such event in which to apply for Franchisor's approval to reconstruct or replace the Franchised Business, which approval will not be unreasonably withheld;

16.1(b)

Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, any principal of Franchisee), is convicted of or pleads guilty or *nolo contendere* to a felony, a fraud, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the Kiddie Academy System, the Marks, the goodwill associated with the Kiddie Academy System and the Marks, or Franchisor's interest in them;

16.1(c)

Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, any principal of Franchisee) is found to have made a material misrepresentation or omission in the application for the franchise;

16.1(d)

Franchisee becomes insolvent or makes a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee or against Franchisee and not opposed by Franchisee;

16.1(e)

Franchisee is adjudicated as bankrupt or insolvent, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other permanent or temporary custodian of Franchisee's assets or property, or any part of its assets or property, is appointed by any court of competent jurisdiction, or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee;

16.1(f)

A final judgment is entered against Franchisee or the Franchised Business which remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed), or Franchisee is dissolved, or a suit to foreclose any lien or mortgage against the Franchised Business or its equipment is instituted against Franchisee and not dismissed within thirty (30) days, or if execution is levied against Franchisee's business or property, or if the real or personal property of the Franchised Business will be sold after levy upon Franchisee's real or personal property by any sheriff, marshal or constable.

16.1(g)

Franchisee continues to employ any person which Franchisee knows or has reason to know has been engaged in, convicted of or pleaded *nolo contendere* to a felony or any other criminal misconduct, or any offense involving moral turpitude, which Franchisor deems relevant to the operation of the Franchised Business;

16.1(h)

Franchisee, an affiliate of Franchisee or any one or more of the personal guarantors of this Agreement misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated with the Marks or Franchisor's rights in the Marks;

16.1(i)

Franchisee, an affiliate of Franchisee or any one or more of the personal guarantors of this Agreement contests in any court or proceeding the validity of, or Franchisor's rights in, any of the trademarks, service marks, or other rights licensed under this Agreement;

16.1(j)

Franchisee, an affiliate of Franchisee or any one or more of the personal guarantors of this Agreement, contrary to the terms of Sections 10 or 11 of this Agreement, discloses or divulges the contents of the Kiddie Academy Manuals, Franchisor's trade secrets or other confidential information provided to Franchisee by Franchisor;

16.1(k)

Franchisee, an affiliate of Franchisee or any one or more of the personal guarantors of this Agreement fails to comply with and/or breaches the in-term covenants in Section 18 of this Agreement;

16.1(l)

Franchisee or any partner, shareholder, member or manager of Franchisee, as the case may be, purports to transfer any rights or obligations under this Agreement or any interest in Franchisee or the Franchised Business to any third party without Franchisor's prior written consent, contrary to the terms of Section 15.2 of this Agreement;

]

16.1(m)

Franchisee fails to effect an approved transfer within a reasonable time, as required by Section 15.10 of this Agreement, following Franchisee's death or mental incompetency;

16.1(n)

Franchisee operates, or fails to maintain, the Kiddie Academy Franchise in such a fashion that it becomes a threat or danger to public health or safety;

16.1(o)

Franchisee fails to maintain any license required by law to provide child care or other services contemplated under this Agreement;

16.1(p)

Franchisee maintains false books or records, or knowingly submits any false reports to Franchisor;

16.1(q)

Franchisee submits to Franchisor on two (2) or more separate occasions at any time during the term of this Agreement or any renewal, any reports or other data, information or supporting records which understate the Gross Revenues of the Franchised Business, the royalty fees and/or any other sums owed to Franchisor for any period of, or periods aggregating, three (3) or more weeks, and Franchisee is unable to demonstrate that such understatements resulted from inadvertent error.

16.1(r)

Franchisee knowingly fails to comply with the provisions of Section 19 of this Agreement;

16.1(s)

Franchisee or one or more of the personal guarantors of this Agreement defaults or otherwise fails to perform any material term under any material lease, contract (including, without limitation, contracts with insurance companies and/or insurance brokers for the provision of insurance coverage for the Kiddie Academy Franchise, and contracts with states and/or local government agencies), financing or similar agreement in connection with the Kiddie Academy Franchise, regardless of whether Franchisee has been notified by its landlord or another party of such default or failure to perform;

16.1(t)

Franchisee, after curing a default pursuant to Section 16.2 of this Agreement, commits the same act of default again within six (6) months;

16.1(u)

Franchisee is in default under Section 16.2 of this Agreement more than twice in any calendar year or more than three (3) times during any five (5) year period for failure to substantially comply with any of the requirements imposed by this Agreement;

16.1(v)

Franchisee fails, refuses or neglects promptly to pay when due any monies owing to Franchisee's landlord (unless as a result of a bona fide dispute with the landlord, subject, however, to Franchisee's payment, into escrow, of all disputed rentals), regardless of whether Franchisee has been notified by its landlord of such failure to pay.

## Termination After Notice and Opportunity to Cure        16.2

Except as provided in Section 16.1 of this Agreement, Franchisee will have thirty (30) days after its receipt from Franchisor of a written notice of default within which to remedy any default under this Agreement (or, if the default cannot reasonably be cured within such thirty (30) days, to initiate within that time substantial and continuing action to cure the default), and to provide evidence of an attempt to remedy the default to Franchisor. If any such default is not cured within that time (or, if appropriate, substantial and continuing action to cure the default is not initiated within that time), or such longer period as applicable law may require, Franchisor, at its option, may terminate this Agreement, effective immediately upon Franchisee's receipt of Franchisor's notice of such termination, or, in any event, within five (5) days from the date such notice is mailed. Franchisee will be in default under this Agreement for any failure to comply substantially with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Kiddie Academy Manuals, or to carry out the terms of this Agreement in good faith. The defaults will include, without limitation, the occurrence of any of the following events, each of which Franchisee hereby agrees constitutes "good cause" for termination of this Agreement:

16.2(a)

If Franchisee or any affiliate of Franchisee fails, refuses or neglects promptly to pay when due any monies owing to Franchisor or its affiliates, other than the Franchise Fee, or fails, refuses, or neglects promptly to submit the financial or other information and reports required by Franchisor under this Agreement or any other agreement to

which Franchisor and either the Franchisee or one or more of Franchisee's affiliates are parties;

16.2(b)

If Franchisee or one or more of Franchisee's affiliates fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement or any other agreement to which Franchisor and either Franchisee or one or more of Franchisee's affiliates are parties, or the Kiddie Academy Manuals, or if Franchisee or an affiliate of Franchisee fails to comply with any provision of this Agreement or any other agreement to which Franchisor and either the Franchisee or one or more of Franchisee's affiliates are parties;

16.2(c)

If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

16.2(d)

If Franchisee fails, refuses, or neglects to use, maintain and/or upgrade the Business Management System and the Business Management System Reports as required by Franchisor;

16.2(e)

If Franchisee fails to deliver to Franchisor any of the Weekly Reports, Monthly Reports and other information specified in Sections 12.8 and 12.9 of this Agreement, as required therein.

16.2(f)

If Franchisee or an affiliate of Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Marks;

16.2(g)

If Franchisee or one or more of Franchisee's affiliates, by act or omission, permits a continued violation in connection with the operation of the Franchised Business or any other Kiddie Academy Franchise of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administrative or judicial forum for relief, and fails to immediately notify Franchisor of that violation;

16.2(h)

If Franchisee fails to refurbish the Franchised Business in accordance with Sections 3.2 and 6.14 of this Agreement;

16.2(i)

If Franchisee fails to maintain a good credit rating by failing to make prompt payment of undisputed bills, invoices or statements from suppliers of products and services;

16.2(j)

If Franchisee fails to obtain execution of the covenants required under Sections 11.3 and 18.10 of this Agreement;

16.2(k)

If Franchisee fails to attend and complete to Franchisor's satisfaction the training program, as required under Section 8 of this Agreement;

16.2(l)

If Franchisee fails to send to Franchisor copies of all inspection reports issued by applicable governmental authorities, as required by Section 6.14 of this Agreement;

16.2(m)

If Franchisee fails to maintain any of the types or amounts of insurance coverage for the Kiddie Academy Franchise, as specified in Section 14.2 of this Agreement.

16.2(n)

If Franchisee fails to deliver to Franchisor a copy of Franchisee's annual state and federal income tax returns and any amended state or federal income tax return as specified in Section 12.10 of this Agreement.

16.2(0)

Franchisee fails to notify Franchisor in writing when one or more liens or judgments are filed against the Franchisee, the Franchised Business or one or more of the personal guarantors (if any) under this Agreement.

## Franchisor's Operation of the Franchised Business 16.3

In addition to Franchisor's right to terminate this Agreement, and not in place of that right or any other rights against Franchisee or any personal guarantor of this Agreement, after notifying Franchisee of its default under this Agreement (except that as to those defaults for which Franchisee is entitled to a 30-day opportunity to cure, Franchisor may exercise the rights described below only if such default is not cured within the aforesaid 30-day cure period), Franchisor may at its option enter upon the premises of the Franchised Business and exercise complete authority with respect to the operation and administration of the Franchised Business until such time as Franchisor determines that the default of Franchisee has been cured and that there is compliance with the requirements of this Agreement. Franchisee specifically agrees that a designated representative of Franchisor may take over, control and operate the Franchised Business, including, without limitation, all financial and monetary aspects of the Franchised Business, and that Franchisee will pay Franchisor a service fee of not less than Seven Hundred and Fifty Dollars ($750.00) per day or any part of a day, plus all travel expenses, room and board and other expenses reasonably incurred by each representative of the Franchisor as long as the Franchisor requires its representative(s) to be located at the Franchised Business to enforce compliance with this Agreement. The fee and all expenses are payable by electronic impound (as described in Section 7.6 of this Agreement) within seven (7) days of the Franchisee's receipt of the billing statement reflecting the costs incurred by Franchisor. Franchisee and all personal guarantors of this Agreement further agree that if, as provided in this Section 16.3, Franchisor temporarily operates the Franchised Business for Franchisee, Franchisee and the guarantor of this Agreement, if any, hereby agree to indemnify and hold harmless Franchisor and any and all representatives of Franchisor who may act under this Section 16.3, respecting any and all acts and omissions, including negligence, which Franchisor or any of its representatives may perform or fail to perform, with respect to the interests of the Franchisee, the guarantors and all third parties.

## Franchisor's Damages As a Result of Termination 16.4

Franchisee agrees that any termination of this Agreement under Section 16.1 or Section 16.2 hereof would result in damages to the Franchisor that would be difficult, if not impossible, to calculate because they would include lost profits, damage to goodwill, and harm to the Marks. Accordingly, the parties agree that in such instances, Franchisor's measure of damages against the Franchisee shall be, without limitation, the total sum of all future royalties and other fees under this Agreement that otherwise would have been collected from Franchisee during the Term of this Agreement on account of and/or arising from the Franchised Business, and that Franchisor shall be entitled upon such termination to collect such sums from Franchisee, plus all reasonable attorneys' fees and court costs incurred by Franchisor in collecting such sums. Franchisee hereby waives any and all rights and claims against the collection by the Franchisor of all such damages, fees and costs.

**Franchisor's Authority to Notify Creditors**      16.5

    Franchisee hereby authorizes Franchisor to notify any lender, creditor, customer or landlord of the Franchisee or Franchised Business upon the occurrence of any default under this Section 16, or any event or circumstances which the giving or notice or passage of time or both would constitute an event of default under this Section 16, and to otherwise communicate with such lenders, creditors, customers or landlords with respect to any such default, or any such event or circumstance.

**17.**      **OBLIGATIONS UPON TERMINATION OR EXPIRATION**      12 Sections Follow

    Upon termination or expiration of this Agreement, all rights granted under this Agreement, or the Preliminary Agreement previously entered into between Franchisee and Franchisor, will terminate, and:

**Cessation of Operations**      17.1

    The operations of the Franchised Business, as a child care center, school, summer camp or otherwise, by Franchisee, any and all guarantors hereunder, anyone affiliated with Franchisee or such guarantors, or anyone else, must cease immediately and permanently, and Franchisee and all guarantors hereunder, if any, will not, after that time, directly or indirectly represent to the public that they are Kiddie Academy franchisees or hold themselves out as a present or former franchisee of Franchisor.

**Discontinue Use of Marks**      17.2

    Franchisee and all guarantors of this Agreement will immediately and permanently cease to use, in any manner whatsoever, any and all confidential information, methods, procedures, techniques and training associated with the Kiddie Academy System; the Mark "KIDDIE ACADEMY"; and all other Marks and distinctive forms, slogans, signs, symbols, domain names and devices associated with the Kiddie Academy System. In particular, Franchisee and all guarantors of this Agreement will cease to use, without limitation, all signs, public relations and promotional materials, displays, stationery, forms, web sites, web pages and any other articles that display the Marks; provided, however, that this Section will not apply to the operation by Franchisee of any other franchise under the Kiddie Academy System which may be granted by Franchisor to Franchisee. Franchisee will take such action as may be necessary to cancel or assign to Franchisor or Franchisor's designee any assumed name or equivalent registration which contains the Mark "KIDDIE ACADEMY" or any other service mark or trademark of Franchisor, and Franchisee will furnish Franchisor with proof of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

## Assignment of Lease                                    17.3

Franchisee will, at Franchisor's option, assign to Franchisor or its designee any interest which Franchisee has in any lease related to the Franchised Business.  Any such lease entered into by Franchisee will contain a clause specifying the title holder's consent to assign that lease to Franchisor or its assigns if this Agreement is terminated. In the event Franchisor does not elect to exercise its option to acquire the lease, Franchisee will make such modifications or alterations to the Franchised Business (including without limitation changing the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to prevent the operation of any business on the premises by itself or others in derogation of this Section 17 and will make such specific additional changes to the premises as Franchisor may reasonably request for that purpose, including without limitation removal of all distinctive physical and structural features identifying the Kiddie Academy System. If Franchisee fails or refuses to comply with the requirements of this Section 17, Franchisor will have the right to enter upon the premises without being liable for trespass or any other tort, for the purpose of making or causing to be made such changes at the expense of Franchisee, which expenses Franchisee agrees to pay upon demand.

## Operation of Another Business                          17.4

Franchisee and all guarantors of this Agreement agree, in the event any one of them operates any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Marks, either in connection with that other business or the promotion of that business, which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's rights in and to the Marks.  Further, Franchisee and all guarantors of this Agreement agree not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

## Payment of Monies Due                                  17.5

Franchisee will promptly pay all sums owing to Franchisor and its affiliates.  In the event of termination for any default of Franchisee, those sums will include all damages, costs and expenses, including any and all future lost royalties and reasonable accounting and attorney's fees, incurred by Franchisor as a result of and/or related to the default.  This obligation will give rise to a lien in favor of Franchisor against any and all of the personal property, furnishing, equipment, signs, fixtures and inventory owned by Franchisee and located on the premises operated pursuant to this Agreement at the time of default, which lien shall remain until all such sums are paid in full.

## Cost of Enforcement                                      17.6

Franchisee will pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement, including without limitation Sections 11, 17 and/or 18.

## Return of Kiddie Academy Manuals and Curriculum          17.7

Franchisee will immediately return to Franchisor all documents, including, without limitation, the Kiddie Academy Manuals, the Kiddie Academy Curriculum, all records, files, instructions, correspondence, brochures, agreements, disclosure statements, invoices, forms, computer files, computer disks, computer software and any and all other materials relating to the operation of the Franchised Business in Franchisee's possession, and all copies of those documents and materials (all of which are acknowledged to be Franchisor's property). Franchisee shall also erase and/or destroy all computer files containing any and all such documents and information. Franchisee will retain no copy or record of any of these documents and materials, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law.

## No Removal of Property                                    17.8

In the event this Agreement is terminated due to Franchisee's default hereunder, Franchisee hereby agrees that it will not, without the prior written consent of Franchisor, remove from the Franchised Business any furniture, fixtures, signs, equipment or other property or leasehold improvements for a period of thirty (30) days following such termination.

## Forfeiture of Signs/Property                              17.9

Franchisor will acquire all right, title and interest in and to any sign, sign faces and other property and materials bearing the Marks. Franchisee acknowledges Franchisor's right to have access to the premises of the Franchised Business throughout the Term of this Agreement and Franchisee's lease agreement should Franchisor elect to take possession of the signs, sign faces or other property and materials bearing Franchisor's Marks. Franchisor's rights under this Section 17.9 shall extend beyond the Term of this Agreement.

## Repurchase Option                                         17.10

Within thirty (30) days from the date of termination or expiration of this Agreement, Franchisee and Franchisor may arrange for an inventory to be made, at Franchisor's cost, of all the personal property, equipment and inventory of Franchisee,

including without limitation any and all items bearing the Marks, related to the operation of the Franchised Business (the "Assets"), which must be completed within ninety (90) days of the date of termination. Franchisor will have the option, to be exercised within thirty (30) days after the inventory is completed, to purchase from Franchisee any or all of the Assets (excluding the Kiddie Academy Manuals, the Kiddie Academy Curriculum, signs and other Kiddie Academy materials bearing the Marks which are acknowledged to be Franchisor's property) at fair market value. If the parties cannot agree on fair market value within a reasonable time, an independent appraiser selected by Franchisor will be designated, and his or her determination will be binding. If Franchisor elects to exercise any option to purchase as provided, it will have the right to set off all amounts due from Franchisee under this Agreement, and the cost of the appraisal, if any, against any payment for the Assets.

## Covenants 17.11

Franchisee will comply with the covenants contained in Section 18 of this Agreement and the confidentiality requirements set forth in Sections 10.2 and 11 of this Agreement.

## Other Obligations 17.12

All obligations of Franchisor and Franchisee which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination for any reason and until they are satisfied or by their nature expire.

## 18. COVENANTS 10 Sections Follow

## Best Efforts 18.1

Franchisee covenants that during the term of this Agreement, it will at all times faithfully, honestly and diligently perform its obligations under this Agreement, and that it will continuously exert its best efforts to promote and enhance the business of the Kiddie Academy Franchise and other franchised businesses established and operated by Franchisee under the Kiddie Academy System.

## Acknowledgment 18.2

Franchisee and all guarantors of this Agreement specifically acknowledge that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including without limitation information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the Kiddie Academy System.

## Covenant of Noncompetition                                    18.3

Franchisee and all guarantors of this Agreement covenant that, during the Term of this Agreement and for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, and continuing for two (2) years thereafter, except as otherwise approved in writing by Franchisor, they will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons or legal entity:

18.3 (a)

Divert or attempt to divert any business or client of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the Kiddie Academy System.

18.3 (b)

Employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment.

18.3 (c)

Own, maintain, operate, engage in, be employed by, provide consulting services to, or have any interest in any business other than a Kiddie Academy Franchise which performs, intends to perform, or will perform in the future, in any respect, educational services and/or daytime child care services to children ages six (6) weeks through twelve (12) years or services similar in scope to the services offered by the Franchised Business and which is, or is intended to be, located or operated within the United States of America or Canada (the "Restricted Area"). Notwithstanding the foregoing, upon termination or expiration of this Agreement, the Restricted Area shall be reduced to include (i) any location inside or within twenty (20) miles of Franchisee's Protected Territory, (ii) any location within twenty (20) miles of any other academy, and (iii) the primary market area served by any business operated by the Franchisor, one or more of its affiliates, or any entity that owns, controls or operates two or more academies under the Marks.

## Covenant Not to Use Confidential Information After Termination     18.4

Franchisee and all guarantors hereof acknowledge and agree that the obligations regarding the use of confidential information and trade secrets set forth in Sections 10.2 and 11.2 of this Agreement will apply throughout the term of this Agreement and after the expiration or termination of this Agreement, without limitation as to time or geographic scope. Franchisee covenants that upon termination or expiration,

Franchisee will immediately and permanently cease to use, in any manner whatsoever, any confidential information, trade secrets, methods, procedures and techniques associated with the Kiddie Academy System.

## Public Corporation Exclusion                    18.5

This section 18 above will not apply to Franchisee's ownership of less than a five percent (5%) beneficial interest in the outstanding equity securities of a publicly-held corporation offering early childhood learning services or care.

## Severability                    18.6

The parties agree that each of the foregoing covenants in this Section 18 will be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section 18 is held unreasonable or unenforceable by a court or agency having valid jurisdiction, in an unappealed or unappealable final decision to which Franchisor is a party, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and a part of this Section 18.

## Scope of Covenant                    18.7

Franchisee understands and acknowledges that Franchisor will have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 18.3 and 18.4 of this Agreement, or any portion of any covenant in Sections 18.3 and 18.4 without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice of that reduction; and Franchisee agrees that it will comply with any covenant as so modified, which will be fully enforceable.

## Cost of Enforcement                    18.8

Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, will not constitute a defense to the enforcement by Franchisor of the covenants in this Section 18. Franchisee agrees to pay all reasonable costs and expenses (including reasonable attorneys' fees) incurred by Franchisor arising from or connected to the enforcement of this Section 18.

## Injunctive Relief                    18.9

Franchisee acknowledges that Franchisee's violation of the terms of this Section 18 would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly agrees that Franchisor may seek to obtain the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 18.

**Confidentiality Agreements** 18.10

At Franchisor's request, Franchisee will require and obtain execution of covenants similar to those set forth in this Section 18 (including covenants applicable upon the termination of a person's relationship with Franchisee) from any personnel, including any principals of Franchisee (if Franchisee is a corporation, limited liability company or partnership); any other personnel employed by Franchisee who have received or will receive training from Franchisor; any officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee; any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; and any of the general partners and any limited partners (including any corporation, and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of any corporation which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership. Every covenant required by this Section 18 will be in a form satisfactory to Franchisor, including without limitation specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required by this Section 18.10 will constitute a default under Section 16.2 (i) of this Agreement.

## 19. TAXES, PERMITS AND INDEBTEDNESS                    5 Sections Follow

**Payment of Taxes** 19.1

Franchisee will promptly pay when due all taxes levied or assessed, including without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the Franchised Business. Franchisee will pay to Franchisor an amount equal to any sales tax, gross receipts tax or similar tax (other than income tax or similar tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**Disputed Tax Liability** 19.2

In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law. In no event, however, will Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the assets of the Franchised Business.

**Permits** 19.3

Franchisee will comply with all federal, state and local laws, rules and regulations, and will timely obtain any and all permits, certificates or licenses necessary

for the full and proper conduct of the Franchised Business, including without limitation licenses to do business, driver's licenses, fictitious name registrations, sale tax, zoning and occupancy permits, and fire clearances.

**Notice of Litigation**          19.4

Franchisee will notify Franchisor in writing within forty eight (48) hours of the commencement of any action, suit or proceeding, and/or of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, any of which may adversely affect the operation or financial condition of the Franchised Business.

**Grant of Security Interest**          19.5

Franchisee will not grant a security interest in any of the assets of the Franchised Business unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, Franchisor will have the right and option to be substituted as obligor to the secured party and to cure any default of Franchisee. In addition, for purposes of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all of the personal property related to and arising from the operation of the Franchised Business of every kind and nature now owned or hereinafter acquired by the Franchisee, including, without limitation, all signs bearing any of the Marks, and all inventory, equipment, trade fixtures, furnishings, furniture, materials, educational tools and accounts, together without all proceeds therefrom (the "Security Agreement"). Any event of default by Franchisee or any affiliates of the Franchisee under this Agreement or any other Agreement to which the Franchisor is a party shall be a breach of the Security Agreement. Franchisee covenants to execute and deliver to Franchisor any and all instruments, documents and filings that Franchisor may reasonably request that Franchisee sign from time to time in order to perfect the security interest granted herein, including, without limitation, UCC-1 financing statements.

**20. INDEPENDENT CONTRACTOR**          3 Sections Follow

**Independent Contractor Status**          20.1

It is understood and agreed by the parties to this Agreement that this Agreement does not create a fiduciary relationship between them; that Franchisee will be an independent contractor; and that nothing in this Agreement is intended to constitute either party as an agent, fiduciary, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose whatsoever.

## Public Representation as Independent Contractor       20.2

During the term of this Agreement and any renewal of this Agreement, Franchisee will hold itself out to the public as an independent contractor operating the Franchised Business pursuant to a franchise from Franchisor.  Franchisee agrees to take such action as may be necessary to evidence this franchise relationship, including without limitation exhibiting a notice of that fact in a conspicuous place in the Franchised Business and on all forms, stationery or other written materials, the content and form of which Franchisor reserves the right to specify.

## Indemnification       20.3

It is understood that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name.  Franchisor will in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action; nor will Franchisor be liable by reason of any act or omission of Franchisee in its conduct in operating the Franchised Business or for any claim or judgement arising from the operation of the Franchised Business against Franchisee or Franchisor.  Franchisee will indemnify and hold Franchisor and Franchisor's members, managers, officers, directors and employees harmless against any and all claims arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchised Business, as well as the costs, including attorneys' fees, of defending against them.   This provision and all of its parts shall survive the termination or expiration of this Agreement.

## 21.    APPROVAL

Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee will make a timely written request to Franchisor for that approval or consent, which will be obtained in writing.  Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

## 22.    NONWAIVER

No failure of Franchisor to exercise any power reserved to it in this Agreement, or to insist upon compliance by Franchisee with any obligation or condition in this Agreement, and no custom of practice of the parties at variance with the terms of this Agreement, will constitute a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement.  Waiver by Franchisor of any particular default will not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different nature; nor will any delay, forbearance or omission by Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any

of the terms, provisions or covenants of this Agreement affect or impair Franchisor's rights; nor will such constitute a waiver by Franchisor of any rights under this Agreement or rights to declare any subsequent breach or default. Subsequent acceptance by Franchisor of any payments due to it will not be deemed to be a waiver of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

## 23.  NOTICES

Any and all notices, demands and requests required or permitted under this Agreement will be in writing and will be personally delivered with a receipt or mailed by United States certified or registered mail, return receipt requested, postage paid, or sent by a nationally recognized overnight courier service, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

|  |  |
|---|---|
| Notices to Franchisor: | Kiddie Academy Domestic Franchising, LLC |
|  | Kiddie Academy Corporate Offices |
|  | 108 East Wheel Road |
|  | Bel Air, Maryland 21015 |
|  | Attn: Michael J. Miller |
|  |  |
| Notices to Franchisee: | Cory and Summer Bullock |
|  | 141 Greenridge Circle |
|  | League City, Texas 77573 |

All notices delivered in the foregoing manner will be deemed to have been given at the time the return receipt is executed, and, in any event, no more than five (5) business days after the notice is mailed.

## 24.  ENTIRE AGREEMENT

This Agreement, the documents referred to in this Agreement, and the attachments to this Agreement constitute the entire, full and complete Agreement between Franchisor and Franchisee concerning the subject matter of this Agreement and supersede all prior agreements. No other representation has induced Franchisee to execute this Agreement, and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not in this Agreement, which are of any force or effect with reference to this Agreement or otherwise. Except for those permitted to be made unilaterally by Franchisor under this Agreement, no amendment, change or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

## 25. SEVERABILITY AND CONSTRUCTION

6 Sections Follow

### Severability

25.1

Except as expressly provided to the contrary in this Agreement, each portion, section, part, term and/or provision of this Agreement will be considered severable; and if for any reason a portion, section, part, term and/or provision in this Agreement is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, that will not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible; and the latter will continue to be given full force and effect and bind the parties of this Agreement; and the invalid portions, sections, parts and/or provisions will be deemed not to be a part of this Agreement.

### No Rights to Other Parties

25.2

Nothing in this Agreement is intended, nor will be deemed, to confer any rights or remedies upon any person or legal entity other than Franchisor or Franchisee, and their respective successors and assigns as may be contemplated by Section 15 of this Agreement.

### Franchisee's Agreement to be Bound

25.3

Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is contained within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions of this Agreement any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

### Captions

25.4

All captions in this Agreement are intended solely for the convenience of the parties, and none will be deemed to affect the meaning or construction of any provision of this Agreement.

### Gender

25.5

All references in this Agreement to the masculine, neuter or singular will be construed to include the masculine, feminine, neuter, or plural, where applicable; and all acknowledgments, promises, covenants, agreements, and obligations in this Agreement made or undertaken by Franchisee will be deemed jointly and severally undertaken by all those executing this Agreement on behalf of Franchisee.

|                     **Counterparts**                     25.6

This Agreement may be executed in several parts, and each copy so executed will be deemed an original.

## 26.   APPLICABLE LAW                              5 Sections Follow

### Effective Date and Governing Law                   26.1

This Agreement takes effect and its Term will commence as of the date it is fully executed by the parties. This Agreement and all of its provisions will be governed, interpreted and construed pursuant to the law of the State of Maryland, which law will prevail in the event of any conflict of law; and the law of Maryland shall be used to enforce any and all rights and duties conferred by and which arise under this Agreement, provided, however, that if any of the provisions of this Agreement would not be enforceable under the law of the State of Maryland, those provisions will be interpreted and construed under the law of the State in which the premises of the Franchised Business are located. The parties further acknowledge and agree that this Agreement and the franchise relationship created by this Agreement will not be subject to the provisions of the Maryland Franchise Registration and Disclosure Law unless the Franchised Business is located in Maryland.

### Consent to Forum                                  26.2

The parties agree that any cause of action by either party against the other that is not subject to the arbitration provisions in Section 27 must be filed in the United States District Court for the District of Maryland or the Circuit Court of Harford County, State of Maryland, and the parties and all personal guarantors hereof do hereby waive all questions of personal and subject matter jurisdiction or venue for the purpose of carrying out this provision.

### Cumulative Remedies                               26.3

No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor will be deemed, exclusive of any other right or remedy in this Agreement or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

### Injunctive Relief                                 26.4

Nothing in this Agreement will bar Franchisor's right to apply for injunctive relief against threatened or actual conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions. Should Franchisor obtain a restraining order or preliminary

injunction against Franchisee, Franchisee shall be liable for all of Franchisor's attorneys' fees and costs that are related to and/or arise from obtaining such relief.

### Costs of Enforcement and Collection 26.5

If Franchisee violates a term or condition contained within this Agreement, including but not limited to, withholding any monies owed to Franchisor in the absence of a court order permitting the withholding of such monies, Franchisee shall reimburse Franchisor for all reasonable costs incurred by Franchisor in pursuing the enforcement of this Agreement. These costs shall include, but not be limited to, court costs, reasonable attorneys' fees, the reasonable value of Franchisor's employees' time, witness fees and travel expenses incurred by Franchisor. This obligation will give rise to and remain, until Franchisee is in full compliance with this Agreement and/or any amounts owed are paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and located on the premises operated pursuant to this Agreement. All costs to be collected by Franchisor pursuant to this provision shall be collected via electronic bank transfer as specified in Section 7.6 of this Agreement.

## 27. ARBITRATION 3 Sections Follow

### Nature of Dispute and Procedure 27.1

Except for disputes regarding (1) the collection of Royalties or other amounts owed by Franchisee under this Agreement, (2) Franchisee's obligation to provide only those services that have been expressly approved by Franchisor, (3) any specification and/or standard operating procedure prescribed by the Franchisor, (4) any covenant listed within Section 17 or Section 18 of this Agreement, (5) infringement of the Marks, or (6) indemnification provisions of this Agreement, all disputes and claims relating to any provision of this Franchise Agreement (including, without limitation, any claim that any provision of this Franchise Agreement is illegal or otherwise unenforceable or voidable under any law or ruling) shall be settled by arbitration in Harford County, Maryland in accordance with the Federal Arbitration Act (9 United States Code, Section 1, et seq.) and the Rules of the American Arbitration Association or other nationally recognized arbitration organization, at Franchisor's discretion, relating to the arbitration of disputes arising under franchise agreements, if any; otherwise, the general rules of commercial arbitration. A single arbitrator shall be used in all instances who shall apply the substantive laws of Maryland. The losing party shall pay all costs of the arbitrator and all costs related to and/or arising from the arbitration proceedings. The arbitrator shall not have the right or ability to alter in any manner the terms, conditions, provisions or covenants of the Franchise Agreement. Further, neither issues of fact nor issues of law determined by the arbitrator will be given preclusive effect. All awards of the arbitrator shall be binding and non-appealable except as otherwise provided in the Federal Arbitration Act. Judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. During the pendency of an arbitration proceeding

hereunder, Franchisee and Franchisor shall fully perform their obligations under this Agreement. Neither Franchisee nor Franchisor shall seek to litigate as a representative of, or on behalf of, any other person, class, or entity any dispute, controversy, or claim of any kind arising out of, or relating to, this Agreement, the rights and obligations of the parties, the sale of the Franchised Business, or other claims or causes of action relating to the performance of either party to this Agreement. No action or proceeding under this Agreement shall add as a party, by consolidation, joinder, or in any other manner, any person or party other than Franchisee and Franchisor and any person in privity with, or claiming through, in the right of, or on behalf of, Franchisee or Franchisor, unless both Franchisee and Franchisor consent in writing. Franchisor has the absolute right to refuse such consent.

## Time of Demand and Statute of Limitations                27.2

If the Franchisee fails to give written notice to the other requesting arbitration under this section within one (1) year of the occurrence of the action or event giving rise to the dispute, any claim of said party relating to the dispute shall be deemed barred, unless prohibited by law, and no further relief, whether by way of arbitration or action or defense in any court, shall be permitted.

## Specific Enforcement and Injunctive Relief                27.3

Nothing herein, including without limitation the provisions of this Section 27, shall bar Franchisor's or Franchisee's right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause it loss or damage under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions. Should Franchisor obtain a restraining order or preliminary injunction against Franchisee, Franchisee shall be liable for all attorneys' fees and costs incurred by Franchisor that are related to and/or arise from obtaining such relief.

## 28.    ACKNOWLEDGMENTS                                4 Sections Follow

## Independent Investigation                                28.1

Franchisee has conducted an independent investigation of the Franchised Business and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessperson. Franchisor expressly disclaims the making of, and Franchisee acknowledges that Franchisee has not received, any warranty or guarantee, express or implied as to the potential volume, profits, earnings or success of the business venture contemplated by this Agreement.

## Receipt of Disclosure 28.2

Franchisee acknowledges receipt of a complete, executable copy of this Agreement, the Exhibits to this Agreement, and all agreements relating to this Agreement at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges receipt of the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.

## Terrorism 28.3

Franchisee acknowledges that under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (the "Order"), Franchisor is prohibited from engaging in any transaction with any Specially Designated National or Blocked Person. "Specially Designated National" or "Blocked Person" shall mean (1) those persons designated by the U.S. Department of Treasury's Office of Foreign Assets Control from time to time as a "specially designated national" or "blocked person" or similar status, (2) a person engaged in, or aiding any person engaged in, acts of terrorism, as defined in the Order, or (3) a person otherwise identified by government or legal authority as a person with whom Franchisor is prohibited from transacting business. Currently, a listing of such designations and the text of the Order are published at the Internet website address, www.ustreas.gov/offices/enforcement/ofac. Accordingly, Franchisee represents and warrants to Franchisor that as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in Franchisee, controlled by Franchisee, or under common control with Franchisee is a Specially Designated National or Blocked Person, and that Franchisee (1) does not, and hereafter shall not, engage in any terrorist activity; (2) is not affiliated with and does not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (3) is not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity. Franchisee agrees that Franchisee shall immediately provide written notice to Franchisor of the occurrence of any event which renders the representations and warranties in this Section 28.4 incorrect.

## Opportunity to Consult 28.4

Franchisee has read and understands each and every provision, obligation and covenant of this Agreement, the attachments hereto, and any agreements relating hereto. Franchisee hereby agrees that this Agreement contains all of the pages, in the proper order, included in Franchisor's standard Franchise Agreement. Further, Franchisee acknowledges that Franchisor has accorded Franchisee ample time and

opportunity to consult with professional advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**IN WITNESS WHEREOF**, the parties to this Agreement have duly executed and delivered this Agreement, under seal, on the day and year first above written.

**WITNESS/ATTEST:**

**KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC**

By: _____ (SEAL)
Michael J. Miller, President/CEO of
Kiddie Academy International, Inc.,
Authorized Member

Date: _March 12_____, 2007

**WITNESS/ATTEST:**

**FRANCHISEE**

Name: _____
Cory Bullock

Date: __3/12_____, 2007

Name: _____
Summer Martin Bullock

Date: __3/12_____, 2007

**[CONTINUED ON THE NEXT PAGE]**

# PERSONAL GUARANTY

In consideration of, and as an inducement to, the execution and delivery by Kiddie Academy Domestic Franchising, LLC ("Kiddie Academy") of the Franchise Agreement, each undersigned hereby personally and unconditionally, jointly and severally, (1) guarantees to Kiddie Academy and its successors and assigns, for the term of the franchise and thereafter as provided in the Franchise Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Franchise Agreement, of which this Personal Guaranty forms a material part, and (2) agrees to be personally bound by, and personally liable for the breach of, each and every term, provision, agreement and covenant contained in the Franchise Agreement, as if he/she/they were the original Franchisee thereunder.

Each of the undersigned waives: (1) acceptance and notice of acceptance by Kiddie Academy of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations guaranteed hereby; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed hereby; (4) any right he may have to require that an action be brought against the Franchisee or any other person as a condition of liability; (5) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution or an performance under this guaranty by the undersigned; and (6) any and all other notice and legal or equitable defenses to which he/she may be entitled.

Each of the undersigned consents and agrees that: (1) his/her direct and immediate liability hereunder shall be joint and several not only as to the Franchisee, but also between and among the undersigned; (2) he/she shall render any payment or performance required under this Agreement upon demand if Franchisee fails or refuses under any and all circumstances to do so; (3) such liability shall not be contingent or conditioned upon pursuit by Kiddie Academy of any remedies against Franchisee or any other person or entity; (4) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Kiddie Academy may from time to time grant to Franchisee or to any other person or entity, including, without limitation, the acceptance or any partial payments or performance, the compromise or release of any claims, or the assignment of asset to Kiddie Academy in lieu of payment; none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable throughout the term of this Agreement and for so long thereafter as there are monies and obligations owing by Franchisee to Kiddie Academy under this Agreement; and (5) the written acknowledgement of Franchisee, accepted in writing by Kiddie Academy, or the final judgment of any court, arbitrator or arbitration panel of competent jurisdiction establishing the amount due from Franchisee shall be conclusive and binding on the undersigned as guarantors.

If Kiddie Academy asserts a claim for amounts owed by Franchisee to Kiddie Academy hereunder, or if Kiddie Academy enforces this Personal Guaranty, Kiddie

Academy shall be entitled to reimbursement of its costs and expense, including, without limitation, reasonable accountants, attorneys, arbitrators and expert witness fees, costs of investigation and proof of facts, court costs, all other litigation expenses, and travel and living expenses arising from or related to such investigation, proof of facts and/or litigation, whether incurred prior to, in preparation for, during, or in contemplation of the filing and pursuit of such proceeding. If Kiddie Academy engages outside legal counsel as a result of one or more of the undersigned failing to comply with this guaranty, all of the undersigned shall be liable, jointly and severally, for the reimbursement to Kiddie Academy for all of the costs, expenses and fees incurred by Kiddie Academy related to and/or arising from such engagement.

IN WITNESS WHEREOF, each of the undersigned has affixed his/her signature on the same day and year as this Agreement was executed.

_____   _____(SEAL)
WITNESS                    GUARANTOR

                           Name: Cory Bullock
                           Address: 141 Greenridge Circle
                                    League City, Texas 77573

                           Date:_____3/12_____, 2007


_____   _____(SEAL)
WITNESS                    GUARANTOR

                           Name: Summer Martin Bullock
                           Address: 141 Greenridge Circle
                                    League City, Texas 77573

                           Date:_____3/12_____, 2007


**[CONTINUED ON THE NEXT PAGE]**

**KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC**

## Exhibit A to Franchise Agreement

The location of the Franchised Business is:

The individual plot of real property, consisting of approximately 1.5 acres,
located at the northwest quadrant of the intersection of
League City Parkway (SH 96) and Tuscan Lakes Boulevard,
League City, (Galveston County) Texas, within the zip code: ~~30004~~

Upon the opening of the Kiddie Academy Franchise, the Franchised Business shall be
known at all times thereafter as the "Kiddie Academy® of League City."

Franchisor's Signature: _____ 3/12/07
                                       Michael J. Miller, President and CEO    Date
                                         of Kiddie Academy International, Inc.,
                                         sole member of Kiddie Academy
                                         Domestic Franchising, LLC.

Franchisee's Signature: _____ 3-12-07
                                       Cory Bullock                             Date

Franchisee's Signature: _____ 3/12/07
                                       Summer Martin Bullock             Date

# KIDDIE ACADEMY DOMESTIC FRANCHISING, LLC

## Exhibit B to Franchise Agreement - ADA Certification

Kiddie Academy Domestic Franchising, LLC ("Franchisor") and Cory Bullock and Summer Martin Bullock, husband and wife (collectively, "Franchisee") are parties to a Franchise Agreement dated *March 12*____, 2007 (the "Franchise Agreement") for the operation of a Kiddie Academy Franchise at: the individual plot of real property, consisting of approximately 1.5 acres, located at the northwest quadrant of the intersection of League City Parkway (SH 96) and Tuscan Lakes Boulevard, League City, (Galveston County) Texas, within the zip code: 30004, in accordance with Section 6.8 of the Franchise Agreement, Franchisee certifies to Franchisor that, to the best of Franchisee's knowledge, the Kiddie Academy Franchise and its adjacent areas comply with all applicable federal, state and local accessibility laws, statutes, codes, rules, regulations and standards, including but not limited to the Americans with Disabilities Act. Franchisee acknowledges that Franchisor has relied on the information contained in this certification. Furthermore, Franchisee agrees to indemnify Franchisor and the members, officers, directors, and employees of Franchisor in connection with any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by the indemnified party(ies) as a result of any matters associated with Franchisee's compliance with the Americans with Disabilities Act, as well as the costs, including attorneys' fees, related to the same.

IN WITNESS WHEREOF, the undersigned has executed this ADA Certification on the _12_ day of _March_____, 2007

| | FRANCHISEE: |
|---|---|
| _____ | _____ |
| Witness/Attest | Cory Bullock |
| _____ | _____ |
| Witness/Attest | Summer Martin Bullock |